ACCU PERSONNEL, INC., Plaintiff,

v.

ACCUSTAFF, INC. and BSI Temporaries
of Delaware, Inc., a.k.a. BSI Temporaries,
Inc., and BSI Temporaries, Defendants.

Civ. A. No. 93–30 MMS.

United States District Court,
D. Delaware.

June 4, 1993.

Jeffrey B. Bove and R. Eric Hutz, of Connolly, Bove, Lodge & Hutz, Wilmington, DE, of counsel, Mark D. Simpson and Donald C. Simpson, of Simpson & Simpson, P.C., Moorestown, NJ; for plaintiff.

Robert H. Whetzel, of Richards, Layton & Finger, Wilmington, DE, of counsel, Laurence R. Hefter and David M. Kelly, of Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff, Accu Personnel, Inc. filed suit against defendants AccuStaff, Inc. and BSI Temporaries, Inc., a.k.a. BSI Temporaries and BSI Temporaries of Delaware, Inc. [hereinafter "defendant"] alleging trademark infringement, unfair competition and deceptive trade practices. Presently before the Court is plaintiff's motion for a nation-wide preliminary injunction against defendant. Plaintiff requests this Court to enjoin defendant from using the mark AccuStaff pending the outcome of the case. For the reasons that follow, the Court will issue a preliminary injunction against use by defendant of the name AccuStaff, but that injunction will be limited to the southern New Jersey and southeastern Pennsylvania geographic areas.

## II. FACTUAL BACKGROUND

Plaintiff and defendant are personnel employment companies providing essentially the same services. Plaintiff, Accu Personnel, Inc., has been in business since 1980. Docket Item ["D.I."] 33 at ¶ 2, 3. The vast majority of its services are provided in southern New Jersey and southeastern Pennsylvania. D.I. 38 at B–88–91, B–333–36. Defendant, AccuStaff, Inc., was incorporated on May 4, 1992, by merger of four predecessor companies whose home offices are as follows: Abacus Services of Virginia Beach, Virginia, BSI Temporaries of Baltimore, Maryland, Metro Temporaries of Louisville, Kentucky, and ATS Services of Jacksonville, Florida. D.I. 47 at ¶ 2. Defendant filed an application to register "AccuStaff" as a service mark with the United States Patent and Trademark Office [the "PTO"] on April 15, 1992. D.I. 44 at ¶ 3.

In early June, 1992, plaintiff learned of the formation of defendant by an article in *Staffing Industry Report*, a trade publication. D.I. 33 at ¶ 29. On June 22, 1992, plaintiff filed an application for the registration of its alleged service mark, Accu. D.I. 1 at ¶ 22. Plaintiff then sent defendant a letter informing defendant it considered use of the AccuStaff name an infringement of its service

mark rights in the name Accu.[1] It also demanded defendant cease and desist from doing business under the name AccuStaff. D.I. 29 at A–57–58.

After discussions between the parties' attorneys, defendant responded on September 21, 1992, that it did not consider its use of the term AccuStaff to constitute an infringement of plaintiff's mark Accu. D.I. 37 at B–52–54. Plaintiff filed its complaint for trademark infringement and unfair competition on January 15, 1993. D.I. 1. This motion for preliminary injunctive relief followed on March 1, 1993, D.I. 12, and was argued on May 19, 1993.

## III. DISCUSSION

■ Four factors must be analyzed in determining whether to issue a preliminary injunction: (1) the likelihood the movant will succeed at a final hearing on the merits; (2) the extent of irreparable harm suffered by the movant as a result of the complained of conduct; (3) the extent of irreparable harm that would be suffered by the non-movant if the preliminary injunction is granted; and (4) the public interest. *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir. 1992). "All four factors should favor preliminary relief before the injunction will issue." *Id.* [2] The parties' arguments as to each of the factors will be addressed seriatim.

### A. Success on the Merits

■ Plaintiff's trademark rights, if any, stem from common law because its mark is not federally registered.[3] In order for a plaintiff to succeed in a trademark infringement case it must show: "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990). In the present case, defendant concedes elements (1) and (2). Only element (3) is in dispute. Analysis will therefore focus on whether defendant's use of the name AccuStaff is likely to create confusion as to the origin of the services.

The Third Circuit Court of Appeals has compiled a nonexclusive list of factors to consider in determining likelihood of confusion. They are as follows:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same

---

1. It is not clear whether plaintiff's alleged service mark is "Accu" or "ACCU." *See* D.I. 29 at A–57 (employing the word in both forms). However, as neither party has addressed the issue, it is apparent neither feels the distinction in the form of the word is important for purposes of this motion. Therefore, the Court will not consider it further.

2. The Third Circuit Court of Appeals has enunciated two different standards for determining when a preliminary injunction should be instituted. One standard is that just given, i.e., a finding that all four factors have been met. *Jiffy Lube,* 968 F.2d at 374. *See also Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 191–92 (3d Cir.1990); *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir. 1987). The other, and more traditional standard, requires the movant demonstrate a likelihood of success on the merits and the probability of harm if relief is not granted. It does not, however, require the movant to prove "the possibility of harm to other interested persons from the grant or denial of the injunction" or that the public interest will be best served by a grant of relief. Instead, it indicates these latter two factors should be taken into account when they are relevant. *Hoxworth v. Blinder,* 903 F.2d 186, 197–98 (3d Cir.1990); *Morton v. Beyer,* 822 F.2d 364, 367 & n. 3 (3d Cir.1987); *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir.1975).

3. Plaintiff's complaint avers that certain specified acts of defendant constitute "an infringement of plaintiffs [sic] common law rights in said mark ACCU." D.I. 1 at ¶ 37.

channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sale efforts are the same;

(9) the relationship of the goods in the minds of the public because of similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 293 (3d Cir.), *reh'g denied en banc*, (3d Cir.), *and cert. denied, sub nom., Altran Corp. v. Ford Motor Co.*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). In the present case, defendant concedes elements (8) and (9) tip in favor of confusion. Defendant also admits that although in a strict sense element (7) does not apply, the fact that these are competing services marketed through the same channels of trade and advertised through the same media makes confusion likely. Plaintiff presents argument as to elements (1), (2) and (5). Defendant asserts that it opposes plaintiff's arguments as to the three elements addressed. It also addresses element (6).[4]

### 1) Element (1)

Element (1) is "the degree of similarity between the marks." This element is highly probative of the likelihood of confusion. The Third Circuit Court of Appeals has held, "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir.1990). In determining the similarity of marks the Court should consider the "appearance, sound and meaning of the marks, as well as the manner in which the marks are used." *American Cyanamid Co. v. S.C. Johnson & Son, Inc.*, 729 F.Supp. 1018, 1021 (D.N.J.1989).

Plaintiff first focuses on the very close resemblance between its mark and that of defendant. Although plaintiff's mark is only the term "Accu" while defendant's is the entire term "AccuStaff," plaintiff points out that the upper case "S" which appears in the middle of defendant's name effectively divides it into two words so that it corresponds to plaintiff's appellation. In addition, plaintiff argues that the manner in which defendant has begun to employ the AccuStaff name deemphasizes the second part of defendant's mark focussing attention on the Accu portion of the word. Defendant has created word combinations such as, "AccuLine—the bottom line from AccuStaff accounting" and "Ask the Accu Visor." D.I. 29 at A–20, 21. These combinations use "Accu" as their dominant identifier and, plaintiff urges, serve to emphasize the Accu portion of defendant's mark.

Plaintiff also notes that the two marks are very similar when heard. This is because a hearer is unable to discern that AccuStaff is in fact one word or that Accu Personnel is two. Furthermore, defendant's formation of word combinations is particularly effective in focussing attention on the Accu portion of defendant's mark when the audience is a listening one.

Plaintiff's arguments are persuasive in demonstrating the marks are similar in appearance, sound and manner of use. This is particularly true in light of defendant's emphasis on the "Accu" portion of its mark. In assessing similarity, it is appropriate for the Court to "'recognize that one feature of a mark is more significant than the other features and to give greater force and effect to that dominant feature.'" *American Cyanamid*, 729 F.Supp. at 1022 (quoting *Burger Chef Systems, Inc. v. Sandwich Chef, Inc.*, 608 F.2d 875, 878 (C.C.P.A.1979)). The Accu portion of defendant's mark is the dominant feature. Comparison of that feature with plaintiff's mark shows the two to be identical. For this reason, the overall impression created is that the two are very similar.

Plaintiff also argues that the response of the United States Patent & Trademark Office ["PTO"] shows the marks to be very similar. While not binding on this Court, decisions of the PTO regarding registration may have persuasive force. *Syntex Lab., Inc. v. Norwich Pharmacal Co.*, 437 F.2d

---

4. Arguably elements (4) and (10) have no application in the instant circumstances.

566, 569 (2d Cir.1971). In an Office Action issued by the PTO the examining attorney stated that "[t]here may be a likelihood of confusion between the two marks. . . ." presumably meaning Accu and AccuStaff. D.I. 29 at A–71. Defendant urges the Court to accord no weight to this determination by the examining attorney noting that the attorney merely indicated a likelihood of confusion *may* occur and that such statement was not part of any final agency action. The Court finds such statement to be of little probative value because is not clear from the record on what basis the examining attorney concluded confusion might result.

The Court concludes defendant's mark is very similar to plaintiff's. The two marks are similar in appearance, sound and manner of use. The Court also notes they convey the same meaning.[5] Thus, the similarity element weighs heavily in favor of a finding defendant's mark is likely to cause confusion concerning the origin of defendant's services.

### 2) Element (2)

■ Plaintiff urges the Court find its mark is fanciful rather than descriptive and is therefore a strong mark. The strength of a mark is a measure of the mark's distinctiveness, "or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). Strong marks are generally accorded greater protection than are weak marks. *See Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 297 (3d Cir.), *reh'g denied en banc*, (3d Cir.), *and cert. denied, sub nom., Altran Corp. v. Ford Motor Co.*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). Strength of marks has been said to derive not just from their classification as fanciful, descriptive, etc., but also from the marketplace recognition enjoyed by the mark. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 11.25[2] at 11–137 (3d ed. 1992). In addition, the use of a mark by third parties may

impact its strength. *Id.* § 11.26 at 11–139–43.

■ The classification of marks are often dependent upon the mark's location along a distinctiveness spectrum which ranges from "fanciful" and "arbitrary" at one end, followed by "suggestive" then by "descriptive" and finally by "generic" terms which cannot be trade or service marks. Fanciful marks are words that have been coined solely for the purpose of functioning as trademarks. Arbitrary marks are words which enjoy common usage, but are employed in relationship to the good or service so as to "neither suggest nor describe any ingredient, quality or characteristic" of such good or service. *Ford Motor Co.*, 930 F.2d at 292 n. 18 (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:4 (2d ed. 1984)). Suggestive marks are the same as arbitrary marks, but they "suggest a quality or ingredient" of the goods or services. Finally, a mark may be called descriptive if it describes the intended purpose, function, use, size or desirable characteristic of the goods, the class of users of the goods or the end effect upon the user. *Id.* Generally, the closer to the fanciful/arbitrary end of the spectrum a mark is found to fall, the stronger it is said to be. Fanciful, arbitrary and suggestive marks are termed "inherently distinctive." If a mark is found to be descriptive, it is not inherently distinctive and its proponent must demonstrate the mark has acquired distinctiveness through secondary meaning in order for the mark to merit protection.[6] Plaintiff has presented no evidence as to secondary meaning.

Plaintiff argues Accu is a fanciful mark, one coined for the sole purpose of serving as a trademark. According to plaintiff "Accu" has no meaning in the English language, nor would a consumer hearing the word for the first time identify it with employment services. Defendant on the other hand, refers to plaintiff's mark as "laudatory," presumably implying Accu is a descriptive mark. In support it asserts the term Accu is supposed

---

**5.** See discussion pp. 1166–67, *infra*.

**6.** Secondary meaning, in essence, is the development of an association in the minds of consum-

ers between the mark and a single source of the good or service. *See* McCarthy § 15.02[1] at 15–8.

to reflect accuracy on the part of the company and its workers. "[I]t suggests that the agency will accurately place the appropriate personnel for the designated job and that the employees' work will be accurate." D.I. 36 at 17. Plaintiff apparently agrees since its principal, Delores Pass Kesler ["Kesler"], admitted she selected the name because "it had a meaning of accuracy." D.I. 37 at B–164–65.

The Court finds that Accu cannot properly be termed a fanciful mark since to prospective purchasers it would bear a "logical or suggestive relation to the actual characteristics of the goods...." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986). Labeling the term "Accu" fanciful would also be incorrect because although it may not be a defined word in the English language, it is not entirely concocted without reference to the English language as, for example, is the fanciful mark "Kodak." *See Eastman Kodak Co. v. Rakow*, 739 F.Supp. 116, 117 (W.D.N.Y.1989) (finding Kodak to be one of strongest marks in world). On the other hand, because "Accu" is not itself a word in the English language, it cannot properly be termed descriptive. It appears the best characterization of the mark would be "suggestive." [7]

The Third Circuit Court of Appeals has formulated a test for determining whether marks which convey some meaningful information about the goods are suggestive or merely descriptive.

> A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*A.J. Canfield,* 808 F.2d at 297. In *A.J. Canfield,* the plaintiff had argued the terms "chocolate fudge" contained in the name of a diet soft drink were suggestive rather than descriptive since the terms were meant to convey the sensation of eating chocolate fudge. "Because a fudge-like sensation is said to be difficult to imagine in a diet soda, Canfield claim[ed] the link require[d] imagination and [was] thus suggestive." *Id.* at 298. The court disagreed with plaintiff's premise finding the terms "chocolate fudge" referred not to texture and ingredients, but to taste. The court therefore held "no imagination [was] required for a potential consumer to reach a conclusion about the nature [taste] of Canfield's soda." *Id.*

In the present case, some amount of imagination is required to conclude plaintiff and its employees will be accurate. The term Accu derives from the word accurate, but is not the word itself. It does not immediately convey the character of plaintiff's service. The short leap of the imagination required to derive this meaning renders the mark suggestive.

As a suggestive mark the term Accu is protectable. Its position on the distinctiveness continuum is intermediate. The Court would next look to marketplace recognition to further characterize the strength of plaintiff's mark. However, neither party has submitted evidence as to the significance of the mark Accu in the market as an identifier of the origin of services. It follows the Court cannot measure the mark's strength on the basis of this criteria.

Also relevant to the strength of a mark is the impact of third party use. Where there are numerous similar marks, the mark in question may be found to have been weakened because consumers "have been educated to distinguish between different [such] marks on the basis of minute distinctions." *Standard Brands, Inc. v. RJR Foods, Inc.*, 192 U.S.P.Q. 383 (TMT App.Bd. 1976). This is particularly true where many similar marks compete in the same product line. *See Eclipse Assoc., Ltd. v. Data General Corp.*, 894 F.2d 1114 (9th Cir.1990). Defendant contends plaintiff's mark is weak because it is merely one use of the term Accu in a crowded field. It presents a list of

---

7. The suggestive, and therefore somewhat "weaker," nature of the term Accu is supported by the PTO's treatment of requests for registration of marks containing the term Accu in the field of employment services. For example,

when defendant applied to register the mark AccuStaff, the PTO did not cite the existence of a registration for the mark ACCUSEARCH, for personnel placement services, as a bar to registration. D.I. 44 at ¶ 3.

eighteen personnel service firms from across the United States that use Accu or Accurate as part of their name.

■ In assessing "crowded field" information, it is not the mere existence of names similar to plaintiff's that is relevant. What is at issue is the impact of such existence on the consuming public. *See Charrette Corp. v. Bowater Communication Papers, Inc.*, 13 U.S.P.Q.2d 2040 (TMT App.Bd.1989); *Miss Universe, Inc. v. Little Miss U.S.A., Inc.*, 212 U.S.P.Q. 425 (N.D.Ga.1981). Of the eighteen marks submitted by defendant, the record contains evidence of actual use of the marks by seven firms. Two of those use the word Accurate, and not Accu or some combination of the root Accu with some other suffix. Of the remaining five, only one is located in the same geographic region as plaintiff.[8] Thus, there is little evidence that the consuming public has had to learn to make fine distinctions between similar names due to the abundance of such names used by similar service providers in their market. Defendant's assertion that plaintiff's mark has been weakened by a crowded field is unpersuasive.

Consideration of the evidence presented leads the Court to conclude plaintiff's mark is suggestive and thus entitled to protection without evidence of secondary meaning. There is no persuasive evidence the mark has been weakened by the existence of a field crowded with similar names. The Court therefore finds the mark's strength to be intermediate.

### 3) Element (5)

■ Adoption of a mark in order to take advantage of the good will or reputation of a prior user is probative of likelihood of confusion. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1230 (3d Cir.1978). Plaintiff argues defendant engaged in such wrongful adoption. As evidence, plaintiff asserts defendant knew of plaintiff's prior use of the mark Accu and that defendant initiated and expanded use of the term AccuStaff after plaintiff notified defendant that plaintiff considered defendant's use an infringement of its trademark. Defendant contends it had

no prior knowledge of plaintiff's use of the mark Accu. It also asserts its actions were taken in good faith because it began use of the mark prior to receiving plaintiff's cease and desist letter.

Courts are divided on the question whether bad faith is established merely by virtue of the fact that the junior user has knowledge of the senior user's mark prior to the junior initiating use. Some courts hold such knowledge is sufficient to support a finding of bad faith. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666 (7th Cir.1982); *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 522–23 n. 6 (C.C.P.A.1980). Others require a showing the junior user had some plan antagonistic to the user senior user's interests. *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990); *A.J. Canfield Co. v. Concord Beverage Co.*, 629 F.Supp. 200, 212–13 (E.D.Pa.1985), *aff'd on other grounds sub nom.*, 808 F.2d 291 (3d Cir.1986). The Third Circuit Court of Appeals has displayed only ambivalence on the issue. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 295 n. 4 and 296 n. 7 (3d Cir.1986). Although this Court finds the latter line of cases more persuasive, the issue is moot since defendant cannot be said to have knowledge of plaintiff's use of its mark Accu at the time defendant began using the name AccuStaff.

Plaintiff maintains defendant's adoption of the name AccuStaff constituted bad faith because at the time of adoption defendant knew of the existence and use of plaintiff's mark, Accu. In support plaintiff first points to occasions on which defendant's principal Kesler met principals of plaintiff at meetings of a trade organization of which both plaintiff and Kesler were members. D.I. 33 at ¶¶ 15, 21–26. From this plaintiff concludes Kesler, and thus defendant, knew of plaintiff's use of the mark Accu. Missing from plaintiff's argument, however, is any indication that the encounters between Kesler and plaintiff had anything to do with plaintiff's use of the mark Accu.[9] Instead, the evidence shows

---

8. The relevance of geographic proximity is explored at pp. 1171–73, *infra*.

9. Plaintiff does note that its advertising materials were on display at the location of one of the

that aside from some exchanges of an unknown nature that took place during the course of a panel discussion, the discussions between plaintiff's and defendant's principals were very brief and of a general nature such as an exchange of greetings. D.I. 37 at B118–20; 156–64. Further, these brief exchanges took place between 1984 and 1990, two years or more before defendant selected the name AccuStaff. The Court concludes such exchanges do not demonstrate defendant knew of the plaintiff's use of the mark Accu.

Plaintiff also cites the fact that one of the companies that has merged to become AccuStaff once referred a customer to plaintiff as evidence defendant must have known of plaintiff's use of its mark. D.I. 33 at ¶ 27. Defendant points out, however, that its policy is not to refer a customer outside its area to a specific employment service company in that customer's area, but merely to photocopy the pages of a trade organization directory which pertains to the customer's geographic area. D.I. 45 at ¶ 4. The Court will not, therefore, conclude the reference shows defendant's predecessor had specific knowledge of plaintiff's use of its mark.

Finally, plaintiff contends defendant must have known of plaintiff's use of the mark Accu because in the process of choosing its new name an employee of the defendant was directed to "cross reference a list of names that were being considered for use as the name for the defendant" with the membership directory of the trade organization to which plaintiff belonged. D.I. 29 at A–38. In fact, the directory was only cross referenced for the term "AccuStaff Resources," not for "Accu," "Staff," and/or "Resources." D.I. 46 at ¶ 4. Apparently, no match was found. While the person performing the cross reference search might have come across Accu's listing in the directory depending on whether the search was done on hard copy or computer, the layout of the entries on pages that were searched, etc., the Court concludes this evidence is not sufficient to impute knowledge of plaintiff's use of its mark to defendant.

Defendant presents evidence that its appropriation of the name AccuStaff was in good faith as demonstrated by the manner in which the name was selected. Prior to the merger of defendant's predecessors, the companies held a contest among their employees to arrive at a new name. Of the more than one hundred names submitted, defendant selected the name "Summit Temporaries." D.I. 47 at ¶ 4. However, defendant did not adopt that name because a trademark search disclosed third party uses of that name. D.I. 47 at ¶ 5. Defendant then acted on its second choice, "AccuStaff Resources." *Id.* at ¶ 6. A trademark search for this name disclosed no uses or registration of the term AccuStaff for employment services companies. *Id.* This method of choosing a name is one which indicates good faith. The fact that potential names were drawn from the employee body dispels an inference that defendant searched for names of existing companies with good will which it could appropriate. Defendant did not start out to gain advantage from plaintiff's good reputation since AccuStaff was not its first choice.

Defendant further asserts the reason AccuStaff was chosen was because the name connoted accuracy both in placement of employees and in the service the employees provide. The fact that its first choice was Summit Temporaries, a name also self laudatory, further confirms that defendant's purpose in choosing a name was to communicate some idea of quality to the consuming public, not to benefit from the good will of an established concern. These circumstances indicate defendant's adoption of AccuStaff does not constitute bad faith. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1230 (3d Cir.1978) (naming company after inventor of product not bad faith); *Kampgrounds of America, Inc. v. North Delaware A–OK Campground, Inc.,* 415 F.Supp. 1288, 1296 (D.Del.1976) (after failing to renew KOA franchise, campground business's selection of name A–OK found not in bad faith

encounters between plaintiff and Kesler, D.I. 34 at ¶ 8. There is also some evidence that when plaintiff's and defendant's employees met, plaintiff's employees were wearing name tags that identified their firm. D.I. 33 at ¶ 19.

where name was second choice to AAA–OK, which name could not be adopted due to refusal of American Automobile Association to grant permission to use name of first choice), *aff'd without opinion,* 556 F.2d 566 (3d Cir.1977).

Having determined defendant's initial adoption of the name AccuStaff was in good faith, attention is now turned to the impact of plaintiff's cease and desist letter on defendant's good faith use of the name. On July 2, 1992, plaintiff sent a letter to defendant demanding it cease and desist from any use or plans to use the name AccuStaff. D.I. 29 at A–57–58. Plaintiff asserts that defendant's use of the name AccuStaff prior to notification did not constitute use as a service mark. According to plaintiff, after receiving notification of plaintiff's prior use of the service mark Accu, defendant then began use of the term AccuStaff as a service mark. Because this subsequent service mark use occurred with full knowledge of plaintiff's prior service mark use, plaintiff contends it constituted bad faith. The Court finds both that plaintiff's distinction as to service mark and non-service mark use is unimportant and that defendant's use of the term AccuStaff prior to July 2, 1992, constituted service mark use. Because of the use defendant made of the term AccuStaff prior to notice by plaintiff on July 2, 1992, the Court finds defendant acted in good faith.

Plaintiff's entire argument turns on characterization of defendant's actions in the time period before it sent the cease and desist letter. First plaintiff asserts that for a period of time, the "transition period," after the May 4, 1992, merger which created AccuStaff, AccuStaff, Inc. existed merely as an internal "administrative entity that operated four separate employment companies." D.I. 29 at 15. Plaintiff argues the term was not presented to the public until a much later date. In support it cites information sent by defendant to the media stating "The offices of Abacus, ATS, BSI and Metro will continue to use their current company identities through a transitional period." D.I. 29 at A–

67. An article in an industry publication made the same representation, *Id.* at A–60, as did letters sent to existing and prospective clients.[10] *Id.* at A–61. As evidence the transition period extended beyond the date plaintiff sent its cease and desist letter, plaintiff notes an internal memorandum of defendant dated January 13, 1993, indicating "the Southeast Region will officially become AccuStaff Incorporated on January 18, 1993 . . . ." The memorandum also stated the Southeast Region should begin to answer its phone "AccuStaff" and that new signs, letterheads and transitional brochures would soon be shipped to the offices. D.I. 29 at A–68. Similarly, a January 15, 1993, memorandum announced to employees that ATS's transition to AccuStaff would become official in January 1993 and guided employees on ways to make the transition smooth for consumers. D.I. 29 at A–70.

Although inferences can be drawn from the above circumstantial evidence that defendant did not present the term AccuStaff to the public until after July 2, 1992, defendant's direct evidence rebuts any such inference. First, the principals of all four predecessor companies, now principals of AccuStaff, all state they did not learn of plaintiff's use of the mark Accu until they received plaintiff's cease and desist letter. D.I. 41 at ¶ 3; D.I. 43 at ¶ 3; D.I. 46 at ¶ 3; D.I. 47 at ¶ 7. Second, defendant's principal, Kesler, stated that the new AccuStaff name was immediately added to the predecessor names and that both were used together initially, with the predecessor names being phased out over time. D.I. 37 at 32–33. Third, the declaration of another AccuStaff principal, David Richardson, stated BSI also began using the AccuStaff name immediately after May 4, 1992 by, *inter alia,* answering telephones, "BSI an AccuStaff company." D.I. 46 at ¶ 5. Proposals to prospective clients in May 1992 use both BSI and AccuStaff. *Id.* at Exhibit ["Ex."] 3. The same is true for Abacus, D.I. 42 at ¶ 5, Ex. 3, and ATS. D.I. 47 at ¶ 10, Ex. 10. Thus, defendant did commence use of the name AccuStaff in May of 1992.

---

10. Such letters also announced the formation of AccuStaff. *See* D.I. 41 Ex. 1; D.I. 43 Ex. 1; D.I. 46 Ex. 2; D.I. 47 Ex. 9.

Plaintiff nevertheless asserts that even if defendant had initiated use of the name AccuStaff before July 2, 1992, the Court should not look to such use in determining the question of notice and bad faith. According to plaintiff, the date on which good faith must be tested is the date of the junior user's first use of a term *as a service mark*, not merely as a trade name. The cases plaintiff cites for this proposition are decisions of the PTO in which the PTO was compelled to determine whether or not a term was a service mark so that it could decide whether the term was registrable.[11] Given the differences in focus, purpose and issues between the present case and the PTO registrability cases, the Court finds they are not controlling and provide only minimal, if any, aid in support of plaintiff's position.

Further, the importance of the distinction between trade name usage and service mark usage is belied by plaintiff's own prior actions. In plaintiff's cease and desist letter, plaintiff demanded not that defendant cease all service mark usage of the term AccuStaff, but that defendant cease all use of the name AccuStaff. D.I. 29 at A–57–58. Plaintiff's own insistence that defendant's use of the AccuStaff name was wrongful undermines its present argument regarding the importance of the distinction between trade name and service mark usage.

 Even if the Court were to look only to use of the term AccuStaff as a servicemark, defendant would still have acted in good faith since its use of the term AccuStaff prior to July 2, 1992, constituted service mark use of that term. A name may function as both a trade name and a service mark. Whether a name serves as a service mark is a question of fact to be determined based on the way in which the name is used, and the probable effect of such use on potential customers. *In re Univar Corp.*, 20 U.S.P.Q.2d 1865, 1866 (TMT App.Bd.1991). Both parties agree that in determining if a term is a trade or service mark, the criteria used by the PTO in this regard are relevant. The PTO has looked to various factors including whether use of the name is accompanied by the company address, whether the full corporate name including corporate designer is used, whether the name appears in graphic format that differs from surrounding print, whether the name appears merely to communicate information such as corporate affiliations, *In re Univar*, 20 U.S.P.Q.2d at 168–69, and whether the name is used in conjunction with some other symbol or term that functions as a mark, *In re Stewart Sandwiches Int'l, Inc.*, 220 U.S.P.Q. 93, 95–96 (TMT App.Bd.1983).

The manner in which the term AccuStaff was used by defendants from May to July was not consistent, but sufficient examples of service mark usage exist to satisfy the Court. On proposals for temporary help services sent to prospective clients in May and June of 1992, the AccuStaff name appears at the top of the page along with the predecessor company name. D.I. 46 Ex. 3; D.I. 47 Ex. 10. The names appear in different print style than the other lettering on the page, in bold print and above a line below which falls all conventional print type. The term does not appear with the company address. The term AccuStaff appears by itself without its corporate designer, i.e., Incorporated. It does not appear with other wording which would indicate its use was merely to communicate information such as company affiliation. While it does appear with the name of the predecessor company, under some circumstances two or more marks may simultaneously refer to the same goods or service. *See In re Walker Process Equipment, Inc.*, 233 F.2d 329, 332 (C.C.P.A.1956). These factors indicate such use constituted service mark as opposed to mere trade name use.

Similarly, the mode employed by some AccuStaff employees in answering the telephone during this time period also demonstrates service mark usage. In the declaration of Penny Broadwell she states, "As instructed, I started answering the phone at the Casset Avenue, Jacksonville office of AccuStaff on May 4, 1992 with the following greeting: 'Thank you for calling ATS AccuStaff'.... On or about May 4, 1992, other former ATS offices of AccuStaff also used

---

**11.** Under the Lanham Act, trade or service marks are registrable while terms which constitute mere trade names without more are not registrable.

the greeting 'Thank you for calling ATS AccuStaff' in answering their phones." D.I. 42 at ¶¶ 2, 3.[12]

Based on the foregoing, the Court finds defendant had initiated use of the term AccuStaff as a service mark prior to July 2, 1992. Because defendant's adoption and initial use of the mark predated actual notice to defendant of plaintiff's use of the mark Accu, defendant cannot be said to have acted bad faith. *See Andy Warhol Enterprises, Inc. v. Time, Inc.,* 700 F.Supp. 760, 766 (S.D.N.Y. 1988) (in absence of other indicia, bad faith will not be found merely from fact "defendant did not abandon its project at plaintiff's suggestion").

#### 4) Element (6)

Although plaintiff makes no argument there has been actual confusion, defendant contends there has been none. Certifications by four of defendant's principals state that in the year since they have been using the mark AccuStaff, there has been no actual confusion of the consuming public concerning the two marks. D.I. 41 at ¶ 5; D.I. 43 at ¶ 12; D.I. 46 at ¶ 7; D.I. 47 at ¶ 29. Such statements may be of some probative value to the extent they indicate that there is little likelihood of confusion on a nation-wide basis. They are not, however, probative of whether there is a likelihood of confusion in areas near plaintiff's current trade area. Of specific concern is whether activities of defendant at its Wilmington, Delaware office, located in very close proximity to plaintiff's established area of trade in southern New Jersey and southeastern Pennsylvania, is likely to cause confusion of consumers in that region.

The statements of defendant's principals are not probative as to this issue since, as defendant stated at oral argument, the Wilmington office of BSI "has not been fully converted to an AccuStaff office." That office maintains its original signage in the name of BSI, and presumably uses the double name format (BSI/AccuStaff or BSI an AccuStaff company) in its communications with consumers. Under such circumstances confusion is less likely than if that office were holding itself out solely as AccuStaff, a situation slated to occur in the future if not prohibited by this Court. It is evidence of actual confusion under the later set of circumstances which this element of the Third Circuit Court of Appeals' test is designed to measure. The fact that no actual confusion has occurred under the former set of circumstances is not truly probative of likelihood of confusion.

#### 5) Summary of Likelihood of Confusion Analysis

Defendant concedes two of the potentially relevant elements enumerated by the Third Circuit Court of Appeals, target market and similarity of services, favor a finding of likelihood of confusion. In addition, it concedes that the fact that there are competing services marketed through the same channels of trade and advertised through the same media makes confusion likely. Of the three elements contested, the most important, similarity of the marks, also indicates confusion is likely. Elements (2)(5) and (6) tilt the scale in neither direction because plaintiff's mark can be said to be inherently distinctive, but not particularly strong. Further, defendant's use of its mark does not constitute bad faith and there is no relevant evidence of actual confusion. The Court finds that because the marks are very similar and both represent the same product or service and are targeted at the same potential market, use by defendant of the name AccuStaff is likely to cause confusion concerning the origin of the services.

#### B. Geographic Extent of Plaintiff's Trademark Rights

Defendant asserts that even if plaintiff could enforce its trademark rights, such rights are limited in geographic scope to an

---

**12.** There is evidence to the contrary in the record. For example, the cover page to a bid proposal on which in large bold type appears the words "ATS Staffing" and below in smaller lettering appears "(An AccuStaff Company)." D.I. 47 Ex. 10. In addition on an invoice the word "ABACUS" appears in very large bold stylized print next to a logo. The words "AN ACCUSTAFF COMPANY" appear below in much smaller, non stylized print. D.I. 47 Ex. 12. Such evidence, however, does not prevent a finding that other use constituted service mark use during the relevant period.

area which defendant has termed plaintiff's "trade area." Plaintiff, on the other hand, seeks an injunction against defendant's use of its mark nationally.

■ The geographic scope of an injunction for trademark infringement depends on the market penetration of the senior user's mark. *Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 472 (3d Cir.1990). As plaintiff seeks an injunction national in scope, it must demonstrate market penetration of a national scope. In determining market penetration the court should consider the following factors:

(1) the volume of sales of the trademarked product;

(2) growth trends (both positive and negative) in the area;

(3) the number of persons actually purchasing the product in relation to the potential number of customers; and

(4) the amount of product advertising in the area.

*Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398–99 (3d Cir.), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985).

Plaintiff has not demonstrated market penetration for areas outside southern New Jersey, southeastern Pennsylvania and northern Delaware. This is due in part to a lack of submission of appropriate data. Plaintiff has put nothing in the record as to elements (2), (3) and (4). The only evidence in the record are numbers of customers and dollar values of sales for 1991, 1992 and the early part of 1993. D.I. 38 at B–88–91. These are broken down according to states. But, as defendant points out, and plaintiff concedes, such data do not accurately reflect the amount of business plaintiff transacted in those states. For example, plaintiff purports to have made over $142,000.00 in sales to customers in California. However, as plaintiff conceded at oral argument this figure does not necessarily mean that plaintiff ever placed one temporary employee with a firm in California. Instead, these sales figures are compiled by examining the location to which the billing invoice was sent or the location from which the invoice was paid. It appears that despite

the billing or payment location, the order for services was or could have been made from some location in close proximity to plaintiff's New Jersey offices and the temporary employees placed in southern New Jersey or southeastern Pennsylvania. D.I. 37 at 97–99.

Even examining these figures, however, it is difficult to see how plaintiff could successfully assert it has more than a *de minimis* presence in other parts of the country. In only a handful of states, exclusive of New Jersey and Pennsylvania, has plaintiff ever served more than one or two customers a year, and in only one instance has plaintiff ever serviced more than ten customers per year in any given state.

Defendant has placed into the record a list of plaintiff's sales and numbers of customers by state in which it asserts it has "corrected" the data. The correction was accomplished by removing sales/customers from listings for other states if in fact the sales to those customers emanated from and the client contacts occurred in southern New Jersey or southeastern Pennsylvania. D.I. 38 at B–333–36. This compilation shows that in no case did plaintiff serve more than one or two customers per year in any state outside southern New Jersey or southeast Pennsylvania. Only a handful of states had total sales for the two year plus period which exceeded $5,000.00, and no other state was responsible for more than 1% of plaintiff's sales for any year or partial year.

In short, plaintiff has no evidence to show actual market penetration in areas outside southern New Jersey and southeastern Pennsylvania. It should be noted that plaintiff has never actually asserted that it does business in other parts of the country. All it says is that it "has clients/customers *whose offices are located in* twenty-nine (29) states." D.I. 33 at ¶ 8.

Plaintiff contends even if its market presence is not sufficient to warrant injunctive relief in other areas of the country, it is at least entitled to relief in southern New Jersey, southeastern Pennsylvania and northern Delaware. At oral argument defendant conceded that if plaintiff was found to have met the four requirements for preliminary injunctive relief, plaintiff would be entitled to relief

in what defendant has termed, for the purposes of this motion only, plaintiff's "trade area." This includes southern New Jersey and the Philadelphia area.[13] D.I. 36 at 30–31. The question remaining, therefore, is whether, if plaintiff is entitled to preliminary injunctive relief, such relief should include a region within northern Delaware.[14] The Court finds plaintiff has insufficient market penetration in northern Delaware to justify relief. Plaintiff's customer list indicates it served only two "Delaware" customers prior to defendant's use of the AccuStaff mark. D.I. 38 B–6–87, B–336–438. In one case, the majority of the job orders originated in Pennsylvania, not Delaware. It is impossible to discern where the employees were assigned. D.I. 38 at B–336–92. In the other case, it appears the invoices were sent to Delaware, payment was made from Pennsylvania and the temporaries were assigned to New Jersey. D.I. 38 at B–393–438. The total sales for all services ever performed for these companies was $3,611.00, constituting less than 1% of plaintiff's business in any year. These contacts are not sufficient to establish market presence sufficient to warrant preliminary injunctive relief for northern Delaware.

Plaintiff also argues it is entitled to preliminary injunctive relief for northern Delaware, notwithstanding its lack of market penetration in northern Delaware. The rationale for plaintiff's position is that northern Delaware is part of a region which plaintiff calls the Delaware Valley. As defined by plaintiff, the Delaware Valley encompasses southern New Jersey, southeastern Pennsylvania and northern Delaware. Because it has a strong presence in most of the Delaware Valley, argues plaintiff, it should be granted preliminary injunctive relief as to the whole area. Plaintiff has presented no persuasive argument as to why such areas should be grouped together into one large trade area for purposes of analysis when the evidence shows plaintiff's true trade area is restricted to southern New Jersey and southeastern Pennsylvania. D.I. 38 at B–88–91, B–333–36. It is concluded preliminary injunctive relief should not extend to northern Delaware.

## C. Harm to the Parties

The second and third factors to be considered by this Court in determining whether to provide preliminary injunctive relief are the extent to which plaintiff is suffering irreparable harm, and the extent to which defendant will be irreparably harmed if the preliminary injunction is granted. Irreparable injury may be shown by "loss of control of reputation, loss of trade ... loss of goodwill," possibility of confusion and, most importantly in a suit for infringement of a trade or service mark, "infringement amounts to irreparable injury as a matter of law." *S & R Corp. v. Jiffy Lube, Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir.1992).

In the instant matter, the Court has concluded plaintiff is likely to succeed at trial on its claim defendant is infringing on its trademark. Under the Third Circuit Court of Appeals formulation, therefore, plaintiff has necessarily demonstrated irreparable injury. *Id.*

Defendant's attempt to vitiate this showing is unavailing. Defendant argues plaintiff's delay in moving for a preliminary injunction demonstrates a lack of irreparable injury to plaintiff. Although delay in seeking relief in the form of a preliminary injunction may be some evidence plaintiff will not incur injury, *see Jiffy Lube*, 968 F.2d at 378–79, the present facts do not sustain this proposition. Plaintiff became aware of defendant's intent to use the name AccuStaff in early June of 1992. D.I. 33 at ¶ 29. On July 2, 1992, plaintiff sent defendant a letter asserting defendant's use of the name AccuStaff infringed on plaintiff's rights in its mark Accu. In the letter plaintiff demanded defendant cease and desist from using the name Accu-

---

**13.** Plaintiff has transacted a substantial amount of business in southern New Jersey and the Philadelphia region. Plaintiff's gross sales have grown from $317,725 in 1982 to over nine million in 1992. D.I. 33 at ¶ 5. As previously discussed, almost all such business was transacted in southern New Jersey and southeastern Pennsylvania.

**14.** This question is of particular importance because one of AccuStaff's offices is located in northern Delaware, i.e., Wilmington.

taff. D.I. 29 at A–57–58. Discussions between the parties' attorneys ensued. On September 21, 1992, defendant responded to plaintiff's allegation of infringement denying infringement on the basis that there was no likelihood of confusion. D.I. 37 at B–52–54. Approximately three and a half months later, on January 6, 1993, in the course of settlement negotiations, defendant indicated to plaintiff that it was preparing for national expansion. D.I. 33 at ¶ 7. Plaintiff then filed its suit for trademark infringement and unfair competition on January 15, 1993. D.I. 1. On February 5, 1993, David Richardson of BSI told Doris Damm of plaintiff that AccuStaff was preparing to acquire four additional personnel employment firms in order to expand its market area. D.I. 34 at ¶ 10. This motion for preliminary injunctive relief followed on March 1, 1993. D.I. 12.

To the extent plaintiff delayed institution of legal proceedings in the two and a half months between sending its cease and desist letter and receiving defendant's response, and in the following three and a half months between receiving the response and filing suit, it does appear plaintiff saw no urgent need for a nation-wide preliminary injunction. Viewed from the perspective of the more limited geographic region appropriately the subject of a preliminary injunctive relief, however, plaintiff's delay was not undue. It was apparently in January plaintiff learned of defendant's plans to become aggressive in its expansion plans. D.I. 33 at ¶ 30. It was also on January 14, 1993, plaintiff learned that as of February, 1993, defendant was going to officially change the name of its Wilmington, Delaware, office from BSI to AccuStaff and that the telephones would then be answered identifying the office solely as AccuStaff and the sign outside the office would be changed from BSI to AccuStaff. D.I. 35 at ¶¶ 7–9. Further, in early February plaintiff was informed that the division of defendant in closest geographic proximity to plaintiff was about to expand AccuStaff's market area. D.I. 34 at ¶ 10. Given the apparent lack of threat to plaintiff's trade area prior to this time, and the apparently imminent change of circumstances in January, the Court cannot say plaintiff's timing in seeking preliminary injunctive relief was inappropriate.

It also does not appear defendant will suffer irreparable harm if the Court were to impose a preliminary injunction limited in geographic scope to southern New Jersey and southeastern Pennsylvania. Defendant argued that requiring it to change its name back to Abacus, BSI, Metro and ATS would undermine customer confidence and cost hundreds of thousands of dollars. The preliminary injunction contemplated by the Court would require no name changes since defendant has no offices in southern New Jersey and southeastern Pennsylvania. Thus, the potential for the harm of which defendant complains is eliminated.

Plaintiff faces irreparable harm if preliminary injunctive relief is not granted. Defendant's harm if such relief is granted will be slight.

**D. Public Interest**

Finally, the Court considers whether granting preliminary injunctive relief would be in the public interest. In a suit for trade or service mark infringement, the interest at issue is the interest of the public in not being deceived or confused. *Jiffy Lube*, 968 F.2d at 379. Where, as here, it is likely that defendant's use of its mark will cause public confusion, injunctive relief is in the public interest. *Id.* By geographically restricting the injunction to southern New Jersey and southeastern Pennsylvania the public interest in not being deceived or confused has been met.

**IV. CONCLUSION**

Plaintiff is entitled to preliminary injunctive relief limited in geographic scope to southern New Jersey and southeastern Pennsylvania. Plaintiff is likely to prevail on the merits of its common law service mark infringement claim in those geographic areas. Plaintiff will be irreparably harmed unless a preliminary injunction is issued. Defendant will not suffer irreparable harm if such relief is granted. The public interest will be served by preliminarily enjoining defendant from using the name AccuStaff in southern New Jersey and southeastern Pennsylvania.

The parties shall confer and submit an agreed upon form of injunctive order on or before June 18, 1993. Failing agreement, each party shall submit their proposed form of order on or before the same date.