**ROCKLAND MORTGAGE CORP., a Delaware corporation, Plaintiff,**

**v.**

**SHAREHOLDERS FUNDING, INC., a foreign corporation, d/b/a Rockwell National Mortgage, Defendant.**

**Civ. A. No. 93–211 MMS.**

United States District Court,
D. Delaware.

Oct. 8, 1993.

Vincent M. Amberly of Nath, Lambert & Amberly, Washington, DC, and Charles Gruver, III of Taylor & Gruver, P.A., Wilmington, DE, for plaintiff.

Donald F. Parsons, Jr. and Karen A. Jacobs of Morris, Nichols, Arhst & Tunnell, Wilmington, DE, Robert B. Bodzin and Jeffrey D. Hofferman of Mesirov Gelman Jaffe Cramer & Jamieson, Philadelphia, PA, of counsel, for defendant.

### *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff, ROCKLAND MORTGAGE CORP., has filed suit against defendant, Shareholders Funding, Inc., alleging trademark infringement,[1] unfair competition, and

---

1. More accurately, plaintiff alleges "service mark infringement." D.I. 1 at 6. The Lanham Act defines a service mark as "a mark used in the sale or advertising of services to identify the

deceptive trade practices under the Lanham Act, 15 U.S.C. § 1125(a), the Delaware Uniform Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531 *et seq.,* and the common law. The Court has subject matter jurisdiction over plaintiff's Lanham Act claim pursuant to 28 U.S.C. § 1338(a). The related state statutory and common law claims fall within the Court's pendent jurisdiction pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

■ Plaintiff has moved for a preliminary injunction and defendant has filed a motion for summary judgment. This opinion addresses the former motion.[2] Plaintiff requests the Court enjoin defendant from using the ROCKWELL NATIONAL MORTGAGE mark pending the final outcome of the case. For the reasons which follow, the Court will grant plaintiff's motion for a preliminary injunction.

## II. FINDINGS OF FACT

On July 11, 1988, plaintiff was incorporated in Delaware as Rockland Mortgage Ltd. Docket Item ["D.I."] 1 at 2. Effective August 5, 1988, plaintiff changed its name to ROCKLAND MORTGAGE CORP. and has operated continuously under the name since that time. *Id.* The parties dispute how plaintiff came to choose its name, but both parties agree there is a location in New Castle County known as Rockland, Delaware which consists of one business, residential condominiums, several estates, and a post office which does not deliver mail. D.I. 19 Ex. A at ¶ 5; D.I. 21 at C–16.

For the last five years, plaintiff has provided retail mortgages in New Castle County, Delaware and in several counties within Pennsylvania. D.I. 15 at A–2. During that time, plaintiff has advertised and promoted its mark in those areas through the following media and means: local telephone books, newspapers, radio, flyers, realtor seminars, open house sheets, rate sheets, real estate talk shows, gifts and other promotional items for realtors. D.I. 15 at A–2. Plaintiff has expended more than $100,000 in such promotions. *Id.* As a result of its efforts, plaintiff has developed a sound reputation and has successfully placed mortgages worth over $260,000,000. D.I. 15 at A–2–3. Plaintiff also plans to "expand regionally and then nationally after establishing [itself] in the Delaware and Southeastern Pennsylvania market." D.I. 21 at C–1.

During its first four years of operation, plaintiff was owned by its current president, Kevin Jornlin, and Steven Fasick. D.I. 15 at A–3. On June 12, 1992, Fasick agreed to sell his ownership interest, and "agreed to a one year consulting arrangement and provided other covenants, representations and warranties for payment, in the aggregate, of approximately $200,000.00." D.I. 1 at 3. Fasick, along with two other employees, left plaintiff to become involved with a proposed new retail mortgage company. D.I. 15 at A–3. That company, defendant Shareholders Funding, Inc. ["Shareholders"], was incorporated in Pennsylvania on or around July 6, 1992. D.I. 1 at 3. Plaintiff originally alleged defendant filed a fictitious name certificate with the New Castle County Prothonotary's Office on that same day, indicating it intend-

services of one person and distinguish them from the services of others." 15 U.S.C. § 1127 (1982). A trademark is "any work, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." *Id.* The Court need not determine whether retail mortgages are goods or services, for the statute "generally applies the same principles concerning ... protection to both trade and service marks." *Country Floors, Inc. v. Gepner,* 930 F.2d 1056, 1064 n. 2 (3d Cir.1991). For ease of reference, the Court will use the term "trademark" in this opinion.

**2.** The Court will not consider both motions in the same opinion because "credibility evaluations

are inappropriate in deciding a motion for summary judgment." *Country Floors,* 930 F.2d at 1061. As the Third Circuit Court of Appeals noted, "[i]t is error to rely on the previous resolution of credibility issues [as part of a motion for preliminary injunction] in deciding a motion for summary judgment because such reliance cannot coexist with the requirement ... that no genuine issues of material fact remain outstanding." *Id. See also id.* at 1062 ("the considerations that determine a motion for a preliminary injunction are foreign to those that govern decision on a motion for summary judgment"). The Court therefore has issued its decision on defendant's motion for summary judgment in a separate opinion.

ed to do business under the fictitious name ROCKWELL NATIONAL MORTGAGE. *Id.* At an October 1, 1993 hearing on the present motion ["the hearing"], however, plaintiff conceded it was in error and the parties stipulated the certificate was filed on January 4, 1993.

The circumstances leading up to defendant's selection of its mark are as follows: Defendant was involved in a proposed acquisition, pending since June of 1992, of a New York company known as ROCKWELL EQUITIES INC. D.I. 19 Ex. A at ¶ 7. On November 2, 1992, defendant issued a private placement memorandum setting forth the terms of that acquisition. Defendant's Hearing Exhibit ["DX"] 2. Shortly thereafter on November 25, 1992, defendant filed a fictitious name certificate with the Pennsylvania Department of State indicating defendant intended to do business under the fictitious name ROCKWELL NATIONAL MORTGAGE. DX–1. At the hearing, defendant offered testimony that it began doing business under that name in December of 1992.[3] On February 5, 1993, however, defendant issued an amended private placement memorandum which no longer included the acquisition of ROCKWELL EQUITIES INC. among its terms. DX–3. According to defendant, the acquisition could not go forward because ROCKWELL EQUITIES INC. was no longer sure it wished to be acquired. At that point, as Fasick testified at an unrelated arbitration proceeding, "we were left with a situation where we've got to pick a name, okay, and we wanted to use the name Rockwell if ... Rockwell in New York closed. And if it didn't, we still needed to have the name." D.I. 19 Ex. A–1 at 17. Defendant added the word "NATIONAL" to its ROCKWELL NATIONAL MORTGAGE mark to further distinguish it from plaintiff's ROCKLAND MORTGAGE CORP. mark. D.I. 19 Ex. A at ¶ 9.

Patricia Hobbib, testifying for defendant, stated at the hearing defendant started doing business under the ROCKWELL NATIONAL MORTGAGE mark in Pennsylvania during December of 1992, and in Delaware during March of 1993. For the previous five months, defendant had done business under its Shareholders name. D.I. 19 Ex. A–1 at 20.

As of August 27, 1993, when defendant filed its answering brief, it had eleven offices with three new offices scheduled to open in September of 1993. D.I. 19 Ex. B at ¶ 2. At that time, there was one office in Wilmington, Delaware; seven in Pennsylvania; one in southern New Jersey; one in Maryland; and one in Virginia. *Id.* at ¶ 3. In order to advertise and promote those offices, defendant has spent $27,000 through the following media and means: newspapers, cable television, community seminars, and outside promotional items. D.I. 19 Ex. B at ¶ 11. While defendant claims also to have committed $250,000 to a one year advertising contract, *id.* at ¶ 12, defendant's counsel consulted with his client during the hearing and conceded defendant has actually committed a much smaller sum of not more than $100,000.

Plaintiff and defendant, as retail mortgage companies, compete in both the purchase and refinance mortgage markets. In the purchase market, the source of business is usually professional consumers, such as realtors, who recommend a retail mortgage company to their buyers. D.I. 19 Ex. B at ¶ 4. In the refinance market, the source of business is usually ordinary consumers seeking to refinance their existing mortgages at lower rates. D.I. 19 Ex. B at ¶ 6.

According to defendant, plaintiff was aware defendant was using the ROCKWELL NATIONAL MORTGAGE name "as early as November of 1992." D.I. 19 at 2. By contrast, plaintiff claims it gradually became aware of defendant's commencing use of its mark in February of 1993, when it began to experience instances of actual consumer confusion between the competing retail mortgage companies. D.I. 21 at 3. Those instances, over time, came to include the following: (1) various persons, including real-

---

**3.** In its answering brief, defendant alleges it began doing business under its ROCKWELL NATIONAL MORTGAGE name in Pennsylvania during November of 1992, D.I. 19 at 5, but at the hearing defendant conceded it could not begin doing business without its license, which was issued in Pennsylvania on December 4, 1992.

tors and potential customers, placed telephone calls to plaintiff when they intended to call defendant, and vice versa (D.I. 21 at C–5–8, C–14–17, C–23–24, C–28–29, C–34; Plaintiff's Hearing Exhibit ["PX"] 4); (2) plaintiff received mail intended for defendant (D.I. 21 at C–14, C–23, C–29; PX–1, PX–2, PX–5–8); (3) plaintiff mistakenly paid some of defendant's bills (D.I. 21 at C–14–15); (4) a temporary employee presented herself to plaintiff when she was scheduled to work for defendant (D.I. 21 at C–14); and (5) various persons, including realtors and potential customers, called plaintiff to complain about services rendered by defendant (D.I. 21 at C–6, C–8, C–23, C–32–33). At the hearing, plaintiff produced further evidence of actual confusion, including a flyer sent by a wholesale mortgage lender to its employees. *See* PX–9 (affidavit identifying flyer as the one distributed). The flyer, acknowledging "PHH US Mortgage employees have been confusing" plaintiff and defendant, was intended to dispel that employee confusion as to the two marks at issue in this case. PX–3.[4]

On March 24, 1993, the National Mortgage Bankers sponsored a convention party in Atlantic City, New Jersey. D.I. 15 at A–27. At that party, Fasick approached Janine Smith, an employee of plaintiff, and told her that defendant had benefitted from a series of radio advertisements commissioned by plaintiff. D.I. 15 at A–27; D.I. 21 at C–13–14. Smith also stated, in her affidavit:

> Mr. Fasick stated that his company had not conducted any radio advertising and that numerous consumers had called his office in response to the radio advertising. Mr. Fasick stated that he should probably wait until Kevin Jornlin had a few more drinks before expressing his appreciation to Mr. Jornlin. A short time later, I was

present when Mr. Fasick and Mr. Jornlin discussed this same matter.

D.I. 15 at A–27. Jornlin, too, remembers hearing that several customers were confused as to the source of the radio advertisements. D.I. 15 at A–4. Fasick asserts, however, he mentioned only one confused customer ("someone"), and then only "jokingly." D.I. 19 Ex. A at ¶ 14.

Also on March 24, 1993, plaintiff's counsel mailed a letter to defendant claiming trademark infringement in its use of the ROCKWELL NATIONAL MORTGAGE name.[5] D.I. 19 Ex. A–3. In that letter, plaintiff stated if defendant did not provide an adequate response by April 6, 1993, plaintiff would initiate legal action. *Id.* On April 6, 1993, defendant's counsel mailed a letter to plaintiff denying infringement, claiming "no evidence of actual or likely confusion," and warning that upon initiation of legal action, defendant would seek sanctions under Rule 11 of the Federal Rules of Civil Procedure. D.I. 19 Ex. A–4.

On April 29, 1993, plaintiff filed suit against defendant alleging trademark infringement, unfair competition, and deceptive trade practices. Plaintiff was initially unable to secure its preferred counsel, Vincent M. Amberly, who was in the process of leaving his former law firm. D.I. 21 at C–40. In June of 1993, however, Jornlin authorized Amberly to proceed as counsel for plaintiff. D.I. 21 at C–41. Plaintiff and defendant, through counsel, communicated throughout July of 1993 attempting to settle the dispute without resorting to litigation. D.I. 21 at C–41. For example, on July 12, 1993, Amberly mailed a letter to Robert Bodzin, counsel for defendant, offering specific instances of actual confusion. D.I. 21 at C–43. When Bodzin

---

**4.** The Court admitted PX–3 over defendant's hearsay objection on the ground that the exhibit was not offered to prove the truth of its assertions, and even if it were, it fell under the state of mind exception to the hearsay rule. Fed.R.Evid. 803(3). Courts have responded to such hearsay objections in several ways. "Some have rejected such employee testimony as unreliable hearsay which does not permit cross-examination of the customer, sender or caller as to the reason for the 'confusion.' Other courts have either held that such testimony is not hearsay because not offered to prove the truth of any customer's as-

sertion or is admissible under an exception to the hearsay rule." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.-02[2][c] (3d ed. 1992) (citations omitted) [hereinafter "McCarthy"].

**5.** During argument at the hearing, upon being prodded by the Court, defense counsel conceded it was extremely unlikely there was any connection between the incident at the party and the mailing of the letter from plaintiff's counsel.

offered no response, Amberly testified in his affidavit that "[a]s soon as it was apparent that the Defendant would not be willing to change its name to a less confusing name, Mr. Jornlin authorized me to proceed with the preparation and filing of a Motion for a Preliminary Injunction in this matter." D.I. 21 at C–41.

On August 4, 1993, plaintiff filed the present motion for a preliminary injunction. D.I. 15. On August 27, 1993, defendant joined issue and moved for summary judgment. D.I. 19. Plaintiff replied on September 13, 1993. D.I. 21. On October 1, 1993, the Court held an evidentiary hearing on the preliminary injunction motion.

## IV. DISCUSSION

The Court must analyze four factors in determining whether a preliminary injunction should issue: (1) the likelihood the movant will succeed on the merits at trial; (2) the extent of irreparable harm suffered by the movant as a result of the complained of conduct; (3) the extent of irreparable harm that would be suffered by the non-movant upon the issuance of the preliminary injunction; and (4) the public interest. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 374 (3d Cir.1992). "All four factors should favor preliminary relief before the injunction will issue."[6] *Id.* The Court will discuss each factor in turn.

### A. Likelihood of Success

The rights of plaintiff in its trademark, if any, arise under common law be-

cause the mark is not federally registered.[7] In order to succeed in a trademark infringement case, then, plaintiff must show: "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Opticians Ass'n v. Indep. Opticians*, 920 F.2d 187, 192 (3d Cir.1990). Defendant has presented no argument as to element (2),[8] but disputes elements (1) and (3).

### 1. Validity and Protectability

Plaintiff's mark can be protected only to the extent it is "distinctive." According to the United States Supreme Court, "[t]he general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992) (emphasis in original). That is, unless plaintiff can show its mark is inherently distinctive, plaintiff must prove secondary meaning. Secondary meaning, "in essence, is the development of an association in the minds of consumers between the mark and a single source of the good or service." *Accu Personnel, Inc. v. AccuStaff, Inc.*, 823 F.Supp. 1161 (D.Del.1993) (citing 1 J. Thomas McCarthy, *McCarthy on Trademarks and*

---

6. The Third Circuit Court of Appeals has enunciated two different standards for determining when a preliminary injunction should be instituted. One standard is that just given, i.e., a finding ·that all four factors have been met. *Jiffy Lube*, 968 F.2d at 374. *See also Opticians Ass'n v. Indep. Opticians*, 920 F.2d 187, 191–92 (3d Cir.1990); *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). The other, and more traditional standard, requires the movant demonstrate a likelihood of success on the merits and the probability of harm if relief is not granted. It does not, however, require the movant to prove "the possibility of harm to other interested persons from the grant or denial of the injunction" or that the public interest will be best served by a grant of relief. Instead, it indicates these two latter factors should be taken into account when they are relevant. *Hoxworth v. Blinder*, 903 F.2d 186, 197–98 (3d Cir.1990); *Morton v. Beyer*, 822

F.2d 364, 367 & n. 3 (3d Cir.1987); *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975).

7. In its complaint, plaintiff alleges it "has operated under the name 'Rockland Mortgage Corp.' continuously" since August 5, 1988. D.I. 1 at 2. At no time does plaintiff allege it registered its mark with the Patent and Trademark Office.

8. That element is nonetheless easily disposed of because the Third Circuit Court of Appeals has held that absent federal registration, "the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 (3d Cir.1991), *cert. denied sub nom. Altran Corp. v. Ford Motor Co.*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991).

*Unfair Competition* § 15.02[1] at 15–8 (3d ed. 1992)).

Marks are classified along a spectrum of distinctiveness which ranges from "fanciful" and "arbitrary" marks at one end, to "suggestive" and "descriptive" marks, and finally to "generic" marks at the other end.[9] *Id.* at 1165. Fanciful marks are words coined for the sole purpose of functioning as trademarks. 1 McCarthy § 11.03[1]. *See, e.g., Eastman Kodak Co. v. Rakow,* 739 F.Supp. 116, 117 (W.D.N.Y.1989) ("[t]he Kodak trademark is perhaps one of the strongest and most distinctive trademarks ... in the world"). Arbitrary marks are words which enjoy common usage, but are chosen so as to "neither suggest nor describe any ingredient, quality or characteristic" of the underlying good or service. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 n. 18 (3d Cir.1991), *cert. denied sub nom. Altran Corp. v. Ford Motor Co.,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:4 (2d ed. 1984)). Suggestive marks also enjoy common usage, but they do suggest the underlying good or service, requiring "imagination, thought and perception to reach a conclusion as to the nature" of the good or service. 1 McCarthy § 11.21[1] at 11–107 (quoting *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). By contrast, descriptive marks immediately convey "the intended purpose, function or use of the goods; the size of the goods, the class of users of the goods, a desirable characteristic of the goods, or the end effect upon the user." 1 McCarthy § 11.05[2][a] at 11–20. No imagination is required. *See, e.g., Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571, 580 (D.N.J.1985) (holding HONEY ROAST honey roasted nuts to be descriptive). Generic terms can never be used as marks. 1 McCarthy § 12.01[2].

▮ In classifying a mark, the Court does not look to the intent of the party choosing that mark. Instead, the impact of the mark on the minds of prospective consumers is controlling. "The meaning of a term to a non-purchasing segment of the population is neither relevant nor important." 1 McCarthy § 11.06[2] at 11–27. *See also id.* ("[a] term should be characterized as 'descriptive' only if a substantial portion of prospective customers recognize it as such"). Therefore, contrary to the great weight of argument at the hearing, it does not matter what motivated plaintiff's original principals when they chose plaintiff's mark. What matters is the impact of that mark on prospective consumers of retail mortgages.

▮ A fanciful, arbitrary, or suggestive mark is termed "inherently distinctive," and no proof of secondary meaning is required. *Ford Motor Co.,* 930 F.2d at 292 n. 18. A descriptive mark, however, "is not inherently distinctive and its proponent must demonstrate the mark has acquired distinctiveness through secondary meaning in order for the mark to merit protection." *Accu Personnel,* 823 F.Supp. at 1165 (citation omitted). The classification of a mark is a factual issue, to be resolved by the factfinder. *Ford Motor Co.,* 930 F.2d at 292 n. 18.

Plaintiff contends its mark is suggestive, because its components suggest the qualities of plaintiff's business.[10] Specifically, according to Jornlin, he favored using the ROCKLAND MORTGAGE CORP. name "based upon the strength of the term 'rock' and that mortgage companies dealt with real estate or 'land.'" D.I. 21 at C–2. Smith adds her

---

**9.** McCarthy offers the following example of each classification: "the word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used on apples." 1 McCarthy § 11.22 at 11–118.

**10.** Plaintiff originally urged its mark was arbitrary. Because arbitrary marks are chosen so as to "neither suggest nor describe any ingredient, quality or characteristic" of the underlying good or service, *Ford Motor Co.,* 930 F.2d at 292 n. 18 (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:4 (2d ed. 1984)), plaintiff's attorney has since abandoned the argument that its mark is arbitrary because plaintiff's intent in choosing the mark was to suggest stability in the retail mortgage business. Of course, a user's intent is not controlling on a mark's classification, and the Court is not bound by plaintiff's new arguments.

recollection "that we were choosing a name that could be used regionally and possibly nationally in the future, thus we did not want to choose a name that would be tied to a specific location and become a negative to future expansion of the company."[11] D.I. 21 at C–13.

By contrast, defendant contends plaintiff's mark is descriptive, because it describes the "prestige of [a] well known town in the Wilmington area" containing several estates. D.I. 19 Ex. A at ¶5. In addition, Fasick asserts "we considered many names and finally decided to choose a name that had local significance and would be recognized as a local lender."[12] Id. The recollections of the parties are therefore directly in conflict. Neither party, however, addresses how the average prospective consumer would view plaintiff's mark.

The Court, as factfinder, preliminarily resolves the conflict in favor of plaintiff yet finds its ROCKLAND MORTGAGE CORP. mark to be arbitrary and neither suggestive nor descriptive.[13] The combination of "ROCK" and "LAND" may, in the minds of Jornlin and Smith, suggest certain qualities of stability in the mortgage business. In the minds of potential retail mortgage purchasers, however, the combination is more likely to be simply arbitrary. Potential purchasers may just as easily take the "ROCKLAND" portion of the mark to signify "stony terrain" as "a stable business pertaining to real estate." Cf. Accu Personnel, 823 F.Supp. at

1166 (holding the ACCU mark suggestive because it "derives from the word accurate, but is not the word itself.... [and] [t]he short leap of the imagination required to derive this meaning renders the mark suggestive"). Plaintiff's mark requires more than "imagination, thought and perception to reach a conclusion as to the nature" of its products. 1 McCarthy § 11.21[1] at 11–107 (quoting Stix Products, Inc., 295 F.Supp. at 488). It requires mind reading. The mark is therefore not suggestive.

■ Neither is the mark descriptive, for it does not immediately convey "the intended purpose, function or use of the goods, the size of the goods, the class of users of the goods, a desirable characteristic of the goods, or the end effect upon the user." 1 McCarthy § 11.05[2][a] at 11–20. The Court finds it definitely does not convey the prestige of a widely known neighborhood. In fact, it stretches credulity to find plaintiff had an intention of hitching its fortunes to what is truly an "obscure geographic location in Northern Delaware," D.I. 21 at C–2, which includes only one business.[14] D.I. 21 at C–16. The mark is therefore not descriptive.

Instead, plaintiff's mark is arbitrary, because it enjoys common usage, but "neither suggest[s] nor describe[s] any ingredient, quality or characteristic" of plaintiff's product to the average potential customer. Ford Motor Co., 930 F.2d at 292 n. 18 (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:4 (2d

---

11. Accordingly, Jornlin and Smith claim, they considered names such as UNIVERSAL MORTGAGE and GUARDIAN MORTGAGE before selecting ROCKLAND MORTGAGE CORP. D.I. 21 at C–2, C–13.

12. Accordingly, Fasick claims, they considered local geographic names such as BRANDYWINE, ASHLAND, WILMINGTON, KENTMERE, and ROCKFORD before selecting ROCKLAND. D.I. 19 Ex. A at ¶3.

13. The Court does not consider the protectability of the "MORTGAGE" and "CORP." portions of plaintiff's mark because they are generic, and such names "are regarded by the law as free for all to use." 1 McCarthy § 12.01[2] at 12–5. See A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir.1986) ("[t]he jurisprudence of genericness revolves around the primary significance

test, which inquires whether the primary significance of a term in the minds of the consuming public is the product or the producer").

14. Even if plaintiff's mark originally were linked to the obscure geographic location of the same name, it would still be arbitrary and not descriptive. According to McCarthy, three questions are relevant to determining whether a geographic term is descriptively used: (1) Is the mark the name of the place from which the goods or services actually come? (2) Is the geographic term likely to denote to reasonable buyers that the goods or services come from the place named? (3) Is the place named noted for these particular goods or services? If the answers are "no," as they would be in this case, then the term is most likely arbitrary rather than descriptive. That the mark happens to mirror a geographic location is not decisive. See 1 McCarthy § 14.03.

ed. 1984)). Because it is arbitrary, plaintiff's mark is inherently distinctive and thus both valid and protectable without proof of secondary meaning.

## 2. Likelihood of Confusion

■ Defendant is guilty of infringing plaintiff's mark only if the use of defendant's mark to identify its mortgage services is likely to create confusion concerning their origin.[15] *Opticians*, 920 F.2d at 192. The Third Circuit Court of Appeals has enumerated a nonexclusive list of factors to consider in determining likelihood of confusion: [16]

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of [the] owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the mind of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Ford Motor Co.*, 930 F.2d at 293 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978)). In the present case, defendant concedes element (8) tips the scales in favor of confusion. D.I. 19 at 19 ("the targets are identical"). Arguably, elements (7), (9), and (10) do not apply to the circumstances of this case,[17] so the Court will consider the remaining elements on which both parties present argument.

■ In considering those elements, the Court must take into account the standard of care likely to be exercised by mortgage consumers, for "likelihood of confusion 'should be determined by viewing the two marks from the perspective of an ordinary consumer of the goods or services.'" *Ford Motor Co.*, 930 F.2d at 293 (quoting *Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F.Supp. 338, 345 (E.D.Pa.1988)). Courts often call these ordinary consumers "reasonably prudent buyers." *Id.* In this case, there are two buyer classes: first, ordinary consumers generally seeking to refinance their mortgages; and second, professional consumers, such as realtors, generally seeking to place new mortgages on behalf of buyers of new or existing homes. D.I. 19 Ex. B at ¶¶ 4, 6. When a buyer class is so mixed, "the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class." *Ford Motor Co.*, 930 F.2d at 293. In other words, confusion within the class of ordinary consumers "may give rise to liability even if professional buyers in

**15.** In *Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F.Supp. 338, 345 (E.D.Pa.1988), the court held that the " 'likelihood of confusion' standard is reduced to only a 'possibility of confusion' standard where, as here, a newcomer enters a field already occupied by a long-established business." In that case, the plaintiff had been in business nearly one hundred years. In this case, the Court does not decide whether five years constitutes "long-established," for the Court finds a likelihood of confusion, not a mere possibility of confusion, between the marks of the parties.

**16.** Defendant claims all but the first of these elements are not applicable because they were formulated to determine the likelihood of confusion in cases involving non-competing goods or services. D.I. 19 at 16. In the federal courts, however, these elements "while originally de-

vised for cases of non-competitive goods or services, have often been applied as a tool to analyze the likelihood of confusion question in all types of trademark infringement cases, both competitive and non-competitive." 2 McCarthy § 24.06[4] at 24–46. *See, e.g., Ford Motor Co.*, 930 F.2d 277 (3d Cir.1991); *Accu Personnel*, 823 F.Supp. 1161 (D.Del.1993).

**17.** Elements (7) and (10) do not apply because the "goods"—to the extent mortgages can be considered goods—are competing in the same market. Element (9) does not apply because the mortgages sold by plaintiff and defendant do not "function" as do tangible goods. In any event, to the extent these elements could apply to competing intangibles such as mortgages, they are fully covered by elements (1) through (6) and element (8).

the market are not confused." *Id.* (quoting *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1448 (S.D.Ohio 1990)). The Court will thus consider whether, at the very least, the ordinary consumer is likely to confuse the mortgage services of plaintiff and defendant.

### a. Element (1)

 Element (1), the degree of similarity between the marks, is highly probative of the likelihood of confusion because "if the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians,* 920 F.2d at 195 (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:7 (2d ed. 1984)). In determining similarity, the Court should consider the "appearance, sound and meaning of the marks, as well as the manner in which the marks are used." *Accu Personnel,* 823 F.Supp. at 1164 (citing *American Cyanamid Co. v. S.C. Johnson & Son, Inc.,* 729 F.Supp. 1018, 1021 (D.N.J.1989)).

Plaintiff highlights the resemblance between its mark and that of defendant, particularly in the first syllable. While plaintiff's mark ends in "LAND" and defendant's mark ends in "WELL," the two marks do share the "ROCK" beginning. Indeed, this beginning has resulted in the marks being placed next to one another in mortgage rate listings and other sources. D.I. 19 at Ex. E. To a large extent, then, the two marks are visually similar.

 The two marks are also very similar when heard. The shared first syllable is the dominant syllable, as both marks are pronounced with the emphasis on "ROCK". In other words, the average speaker is likely to pronounce plaintiff's mark as "ROCK-land" and defendant's mark as "ROCK-well." The Court may properly " 'recognize that one feature of a mark is more significant than the other features and . . . give greater force and effect to that dominant feature.'" *American Cyanamid,* 729 F.Supp. at 1022 (quoting

*Burger Chef Systems, Inc. v. Sandwich Chef, Inc.,* 608 F.2d 875, 878 (C.C.P.A.1979)). In this case, the significant feature of both marks is their identical first syllable.

Defendant insists the two marks bear no visual or aural similarity to each other, but offers evidence as to manner of use, that is, that its employees answer its telephones with the phrase "ROCKWELL NATIONAL MORTGAGE." The use of this phrase, defendant argues, further distinguishes defendant's ROCKWELL NATIONAL MORTGAGE mark from plaintiff's ROCKLAND MORTGAGE CORP. mark. Even taking defendant's evidence at face value, the addition of one word with no inherent distinctiveness [18] does not remove the aural similarity between the two marks. In fact, plaintiff introduced testimony at the hearing that defendant answers its telephones, at least on occasion, with the phrase "ROCKWELL MORTGAGE." [19] The Court is persuaded by this testimony. Even were defendant to assiduously emphasize the "NATIONAL" in its ROCKWELL NATIONAL MORTGAGE mark, however, the reasonably prudent purchaser likely would call the plaintiff "ROCKLAND" and the defendant "ROCKWELL," as did both parties and their attorneys during the hearing. The phrase which defendant may use in answering its telephones does not obviate the likely confusion among ordinary consumers.

The Court preliminarily concludes the marks are confusingly similar in appearance, sound, and manner of use. The similarity element, then, weighs heavily in favor of a finding that defendant's mark is likely to cause confusion concerning the origin of its services.

### b. Element (2)

 The second element, the strength of a mark, is "a measure of the mark's distinctiveness, 'or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'" *Accu Personnel,*

---

18. The word "NATIONAL" is descriptive of a geographic area. As such, its addition does not aid in distinguishing defendant's mark from plaintiff's mark.

19. In an unrelated arbitration proceeding, Fasick himself asserted defendant's employees answer its telephones with the phrase "ROCKWELL MORTGAGE." D.I. 19 Ex. A–1 at 21.

823 F.Supp. at 1165 (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). Thus, "the true relative strength of a mark can only fully be determined by weighing two [the conceptual and the commercial] aspects of strength." 1 McCarthy § 11.25[2] at 11–137. The conceptual aspect is the placement of the mark on the distinctiveness spectrum, that is, deciding whether the mark is "fanciful," "arbitrary," "suggestive," "descriptive," or "generic." The commercial aspect is the recognition value of the mark in the relevant market. *Id.* "In addition, the use of a mark by third parties may impact its strength." *Accu Personnel*, 823 F.Supp. at 1165.

■■■ The Court has previously held plaintiff's mark is arbitrary. As such, it is inherently distinctive and a relatively strong mark. It remains for the Court to address the second aspect of the mark's strength, its "actual consumer recognition value" as of this litigation. 1 McCarthy § 11.25[2] at 11–137. Recognition value is low "if the mark lacks significance in the marketplace for identifying the origin of the goods." *Id.* (quoting *Oxford Industries, Inc. v. JBJ Fabrics, Inc.*, 6 U.S.P.Q.2d 1756, 1988 WL 9959 (S.D.N.Y.1988)). That significance is determinable, in part, through advertising and sales. As McCarthy notes, "[m]any arbitrary ... terms may be conceptually and inherently strong, but if they receive little publicity through only meager advertising and feeble sales, they are relatively weak marks in the place where it counts: the marketplace." *Id.* at 11–137–138. Plaintiff offers evidence of advertising and sales which are anything but "meager" and "feeble." Since its incorporation over five years ago, plaintiff has spent "in excess of $100,000 dollars [sic] on advertising and various promotions that emphasized ... its name and mark." D.I. 15 at A–2. *See* D.I. A–6–11 (examples of advertisements). That advertising, coupled with "in excess of two hundred and sixty million dollars ($260,000,-000.00) in mortgages ... successfully placed" to date demonstrates additional strength in plaintiff's mark. D.I. 15 at A–2–3. Not only, it may be assumed, do ordinary consumers do business with plaintiff, but professionals such as realtors have built up valuable business relationships with plaintiff as well. *See* D.I. 15 at A–25, A–28–33.

■■■ Also relevant to the strength of a mark is the impact of third party use. "Where there are numerous similar marks, the mark in question may be found to have been weakened because consumers 'have been educated to distinguish between different [such] marks on the basis of minute distinctions.'" *Accu Personnel*, 823 F.Supp. at 1166 (quoting *Standard Brands, Inc. v. RJR Foods, Inc.*, 192 U.S.P.Q. 383 (T.M.T.App.Bd.1976)). In other words, "in a 'crowded' field of similar marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd." 1 McCarthy § 11.26[1] at 11–140.

Defendant argues that the retail mortgage market is just such a crowded field by pointing to similar names of mortgage lenders, such as AMERICAN FAMILY MORTGAGE, AMERICAN FINANCIAL, and AMERICAN HOME FUNDING. D.I. 19 at 6. The examples defendant offers are similar, but only to one another. Further, they all consist entirely of descriptive or even generic terms. To be sure, plaintiff's mark would be weakened—one of many in a crowded field—if it were simply a descriptive term coupled with the generic ending "MORTGAGE CORP." The arbitrary portion of its mark, however, bears no resemblance to any example from defendant's list. Aside from defendant, there is no other lender whose name begins with "ROCK". *See* D.I. 19 Ex. E. Thus, there is no evidence to suggest that minute distinctions have forced consumers to educate themselves as to the differences between AMERICAN FAMILY MORTGAGE on the one hand and plaintiff's ROCKLAND MORTGAGE CORP. on the other.

The Court preliminarily concludes plaintiff's mark is strong, not only because it is arbitrary and thus inherently distinctive, but also because its consumer recognition value is high. The strength element, then, also tips the scales in favor of a finding of likelihood of confusion.

#### c. Element (3)

Element (3) consists of the price of the goods or services and other factors indicative of the care and attention expected of consumers when making a purchase. As defendant notes, "[t]he purchase of a home and attendant financing is perhaps the most significant purchase any consumer makes" in his or her lifetime. D.I. 19 at 18. Thus, one would expect even ordinary consumers to exercise great care in connection with the selection of a retail mortgage lender. The Court preliminarily concludes this element weighs against a finding that defendant's mark is likely to cause confusion concerning the origin of its services.[20]

#### d. Element (4)

■ The fourth element concerns the length of time defendant has used the mark without evidence of actual confusion arising. The length of use varies inversely with the likelihood of confusion. That is, if a party has used a certain mark for years without any consumers being confused about the source of its services, there is a strong inference that future consumers will not be confused either. *See, e.g., Scott Paper Co.,* 589 F.2d at 1230 (finding no likelihood of confusion in part because "defendant's mark had been utilized ... for over forty years without any evidence of actual confusion").

In the present case, plaintiff argues instances of actual confusion between its ROCKLAND MORTGAGE CORP. mark and defendant's ROCKWELL NATIONAL MORTGAGE mark "began to occur almost immediately" after defendant commenced its use. D.I. 15 at 11. According to testimony offered by defendant at the hearing, it began doing business under its mark in Pennsylvania during December of 1992, and in Delaware during March of 1993. Plaintiff claims instances of actual confusion began as early as February of 1993. D.I. 15 at A–3, A–26–27. Defendant does not directly dispute this time frame,[21] but asserts no actual confusion as to the source of mortgage services exists.[22]

Because little, if any, time passed between defendant's first use of its mark and plaintiff's first brush with instances of actual confusion, the Court preliminarily concludes this element weighs in favor of a finding of likelihood of confusion.

#### e. Element (5)

Element (5) consists of the intent of the defendant in adopting the mark. "Adoption of a mark in order to take advantage of the good will or reputation of a prior user is probative of likelihood of confusion."[23] *Accu Personnel,* 823 F.Supp. at 1167 (citing *Scott Paper Co.,* 589 F.2d at 1230)). In this case, plaintiff argues defendant adopted its mark expressly for that wrongful purpose. As evidence, plaintiff argues defendant knew of plaintiff's prior use of the ROCKLAND MORTGAGE CORP. mark but regardless of that knowledge, initiated use of the ROCKWELL NATIONAL MORTGAGE mark. Plaintiff further highlights defendant's continued use of its mark despite receiving notification that plaintiff considered that use an infringement of its common law trademark. *See* D.I. 19 Ex. A–3 (letter notification). Defendant, in turn, admits knowledge of plaintiff's prior use but asserts its actions were

---

**20.** Plaintiff properly adds, however, that "when there is a strong likelihood of confusion from other factors, even a high level of care exercised by a consumer[] will not be sufficient to overcome likelihood of confusion." D.I. 15 at 11 (citing *Banff Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486 (2d Cir.1988); *Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190 (2d Cir.1971)).

**21.** Defendant does dispute timing, but only concerning the issue of irreparable harm. According to defendant, plaintiff had known of defendant's mark for months, but only brought suit when faced with an imprudent remark by a principal of defendant to the effect that plaintiff's recent radio advertisements had led to inquiries at the offices of defendant. D.I. 19 at 6, Ex. A at ¶ 15. Defendant has never seriously disputed the instances of misdirection which followed the commencement of business under its mark.

**22.** Instead, defendant urges any confusion stems from the "proximity of the names in listings," and nothing more. D.I. 19 at 18. As the Court noted at the hearing, defendant is walking a narrow line as to the definition of "confusion." The Court discusses these arguments in the context of the sixth element. *See infra* at 196–198.

**23.** As McCarthy notes, however, "good faith intentions of an infringer are no defense to a finding of liability." 2 McCarthy § 23.30[2] at 23–192–193.

taken in good faith for two reasons: First, defendant began using its mark prior to receiving plaintiff's letter; and second, defendant chose its mark for reasons unrelated to plaintiff.

The federal courts disagree as to whether "bad faith is established merely by virtue of the fact that the junior user has knowledge of the senior user's mark prior to the junior initiating use." *Accu Personnel*, 823 F.Supp. at 1167. *Compare Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 674–75 (7th Cir.1982) (holding knowledge to be sufficient to support a finding of bad faith) *with GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990) (holding knowledge to be merely the first step in the inquiry). The Third Circuit Court of Appeals has not decided the issue. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 n. 7 (3d Cir.1986) ("[t]hose claims raise interesting issues" not necessary for decision). The Court finds the later line of cases persuasive, and declines to attribute to defendant bad faith absent some "plan antagonistic to [plaintiff's] interests." *Accu Personnel*, 823 F.Supp. at 1167. The Court, therefore, will examine whether defendant adopted its mark in order to take advantage of plaintiff's good will.

According to defendant, it chose the ROCKWELL NATIONAL MORTGAGE mark based on its proposed acquisition, pending since June of 1992, of a New York company known as ROCKWELL EQUITIES INC. D.I. 19 Ex. A at ¶ 7. On November 2, 1992, defendant issued a private placement memorandum setting forth the terms of that acquisition. DX–2. Shortly thereafter on November 25, 1992, defendant filed a fictitious name certificate with the Pennsylvania Department of State indicating defendant intended to do business under the fictitious name ROCKWELL NATIONAL MORTGAGE. DX–1. At the hearing, de-

fendant offered testimony that it began doing business under that name in December of 1992. On February 5, 1993, however, defendant issued an amended private placement memorandum which no longer included the acquisition of ROCKWELL EQUITIES INC. among its terms. DX–3. According to defendant, the acquisition could not go forward because ROCKWELL EQUITIES INC. was no longer sure it wished to be acquired.

By contrast, plaintiff asserted in its complaint that defendant had filed a fictitious name certificate under the ROCKWELL NATIONAL MORTGAGE name with the New Castle County Prothonotary's Office on July 6, 1992, the same day of its incorporation. D.I. 1 at 3. At the hearing, however, plaintiff conceded its information was off by some six months. Accordingly, the parties stipulated that defendant filed its certificate in New Castle County on January 4, 1993.

The Court finds credible inferences of bad faith to have disappeared with plaintiff's conclusion it was in error with respect to the earlier filing date. Had defendant filed the fictitious name certificate some four months earlier than issuing its first private placement memoranda, its reason for choosing its mark—the proposed acquisition—would be suspect as pretextual. The evidence, however, suggests that defendant selected its mark because it believed it would soon acquire a company of substantially the same name. Plaintiff contends defendant added the word "NATIONAL" to its mark precisely because it knew that consumers likely would confuse ROCKLAND MORTGAGE with ROCKWELL MORTGAGE, standing alone. This addition, according to plaintiff, shows intent to capitalize on its good will. The Court does not agree. Given its finding that defendant chose its mark in good faith, the Court finds the addition of the descriptive word "NATIONAL" to be an extension of that good faith—an effort to prevent confusion.[24]

---

**24.** In its opening brief and at the hearing, plaintiff made reference to what is known as the "second comer doctrine," that a junior user has a "duty" to choose a mark so as to avoid likelihood of confusion. D.I. 15 at 18. At best, the doctrine is questionable. McCarthy opines "it is improper to say that a junior user has a 'duty' to

entirely avoid any possibility of confusion. Rather, the rule ... of presuming confusion is triggered only where the senior user's mark is 'highly distinctive' and the junior user is guilty of 'bad faith.' " 2 McCarthy § 23.33[3][d]. *See Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208 (2d Cir.1985) (holding such intent to confuse is

Having determined defendant's initial adoption of its mark was in good faith, the Court turns its attention to the impact of plaintiff's cease and desist letter on defendant's continued use of the mark. On March 24, 1993, plaintiff sent a letter to defendant demanding it cease and desist from any use of the ROCKWELL NATIONAL MORTGAGE mark. D.I. 19 at A–3. Defendant replied by letter on April 6, 1993. D.I. 19 at A–4. In that letter, defendant requested existing evidence of actual confusion but asserted its name "is neither substantially similar to [plaintiff's] name, nor is the use of the 'Rockwell National Mortgage' name likely to cause confusion on the part of consumers." *Id.*

Neither party disputes defendant initiated use of its mark prior to its receipt of plaintiff's letter. Plaintiff argues, however, that defendant demonstrated bad faith by continuing to use its ROCKWELL NATIONAL MORTGAGE mark after being notified plaintiff considered that use an infringement of its own ROCKLAND MORTGAGE CORP. mark. Plaintiff's argument fails. In the Third Circuit, "[c]ontinued use of words that are claimed to infringe, even after notice of the claim, is not evidence of bad faith." *Institute for Scientific Info., Inc. v. Gordon & Breach,* 743 F.Supp. 369, 372 (E.D.Pa.1990). *See also Andy Warhol Enterprises, Inc. v. Time, Inc.,* 700 F.Supp. 760, 766 (S.D.N.Y. 1988) (bad faith will not be found merely from the fact "defendant did not abandon its project at plaintiff's suggestion"). The Court finds defendant has continued to use its mark in good faith, before and during this litigation.

Because the Court concludes defendant did not adopt or continue to use its mark in order to trade upon plaintiff's good will, the intent element weighs against a finding that defendant's mark is likely to cause confusion concerning the origin of its services.

### f. Element (6)

▮ The sixth element, evidence of actual confusion, is among the more probative of the likelihood of confusion. While proof of actual confusion is not required, it is potent evidence that confusion is likely. *Fotomat Corp. v. Photo Drive–Thru, Inc.,* 425 F.Supp. 693, 703 (D.N.J.1977). *See also* 2 McCarthy § 23.02[2][a]. Plaintiff offers powerful evidence that consumers, including professionals in the real estate field, have experienced actual confusion between its mark and defendant's mark. Defendant does not dispute some consumers have been confused. Instead, defendant asserts their confusion is not of the type required to prove "likelihood of confusion" for the purposes of establishing trademark infringement. Faced with a multitude of examples of misdirected mail, telephone calls, and even complaints about the quality of service, defendant claims that such examples do not constitute "confusion." D.I. 19 at 8. Instead, defendant asserts the only type of confusion worthy of judicial scrutiny is that of a party who, faced with particular mortgage services, cannot tell which retail mortgage lender is the source of those services. D.I. 19 at 8–9. Given defendant's position, the definition of "confusion" for trademark purposes assumes major importance.

Webster's New International Dictionary defines "confusion" as "an act of mistaking one thing for another, of failing to note distinctions, and of falsely identifying." Webster's New International Dictionary 477 (3d ed. 1971). The Lanham Act parallels this definition in the context of trademark infringement, forbidding any use which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...." 15 U.S.C. § 1125(a)(1)(A) (1982). Similarly, the Delaware Uniform Deceptive Trade Practices Act states that to engage in a deceptive trade practice is to cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" or to cause "likelihood of confusion or of misunderstanding as to affili-

merely a part of an overall weighing of all factors). Every case cited by plaintiff in its opening brief concerns such bad faith, in the form of intentional copying. D.I. 15 at 18. *See Opticians,* 920 F.2d at 197.

ation, connection, or association with, or certification by, another...." Del.Code Ann. tit. 6, § 2532(a)(2–3) (Supp.1992). Defendant seeks to narrow this language by claiming there must be likely confusion as to the source of services. Yet "[t]he confusion that is remedied by trademark and unfair competition law is confusion not only as to source, but also as to affiliation, connection or sponsorship." 2 McCarthy § 23.04[4][d] at 23–18.

■ To be sure, the evidence of actual confusion must be more than de minimis. 2 McCarthy § 23.02[2][b] (citing *Everest & Jennings, Inc. v. E & J Mfg. Co.*, 263 F.2d 254 (9th Cir.1958), *cert. denied*, 360 U.S. 902, 79 S.Ct. 1284, 3 L.Ed.2d 1254 (1959)). In addition, courts must find a causal connection between the use of similar marks and instances of actual confusion. Evidence must be . viewed in context. *Id.* at § 23.02[2][a]. Defendant urges that in context, evidence of misdirected communications signals carelessness, not actual confusion between the marks. Some courts, on different records, have agreed. *See United States Blind Stitch Machine Corp. v. Union Special Machine Co.*, 287 F.Supp. 468, 471 (S.D.N.Y.1968) (characterizing evidence of actual confusion as "secretarial carelessness caused by a failure to check business addresses"); *Allstate Ins. Co. v. Allstate Inv. Corp.*, 210 F.Supp. 25, 29 (W.D.La.1962), *aff'd*, 328 F.2d 608 (5th Cir.1964) ("mere carelessness"); *Belleville News–Democrat, Inc. v. St. Clair County Publishers, Inc.*, 26 Ill.App.2d 95, 100, 167 N.E.2d 573, 576 (4th Dist.1960) ("inattention and indifference"). Clearly, however, defendant's arguments go to the weight of the evidence and not the type, for "evidence of misdirected letters is entitled to some weight as indicative of a likelihood of confusion." 2 McCarthy § 23.02[2][b] at 23–29 (quoting *Technicon Co. v. Erickson Tool Co.*, 116 U.S.P.Q. 97 (Com'r Pats.1958)). The Court should therefore consider evidence of misdi-

rected communications as well as other evidence, and in doing so, the Court finds plaintiff has demonstrated a great deal more than an "occasional mis-directed letter." *Everest & Jennings*, 263 F.2d at 260.

First, plaintiff offers evidence that various consumers, both ordinary and professional, placed telephone calls to plaintiff when they intended to call defendant, and vice versa.[25] *See* D.I. 21 at C–5–8, C–14–17, C–23–24, C–28–29, C–34; PX–4. In many cases, the caller mistakenly believed plaintiff and defendant were affiliated, attributing the services of defendant to plaintiff. Jornlin, for example, testified that "Ms. Leena Kauffler, a realtor with Gilpin Realty, ... [telephoned] looking for a Kathy Anderson from our 'other' office," when Anderson was an employee of defendant. *Id.* at C–17.

Contrary to defendant's assertions, in many cases the caller also was confused as to the source of retail mortgages. Jornlin testified, for example, that

> Paul Haig of Realty Associates called about a co-op deal ... indicat[ing] that he was calling on the Hunsucker loan and that the people at the co-op had given him our number. Mr. Haig had checked with the real estate firm, Nickels Realty, which verified that the case was sent to ROCK-LAND's telephone number. However, this was an error and Defendant's ROCK-WELL office had been handling this account.

*Id.* at C–7. In this instance, Haig had verified his information in an attempt to remove any doubt as to the source of his account, but still contacted the wrong company. Plaintiff can show other such instances as well, including those in which various consumers, both ordinary and professional, called plaintiff to complain about services rendered by defendant. *See* D.I. 21 at C–6, C–8, C–23, C–32–33.[26]

---

**25.** Plaintiff even offers a list of some of their names. *See* D.I. 21 at C–15.

**26.** Finally, the Court notes what is perhaps the most celebrated instance of actual confusion as to source: At an industry cocktail party, Fasick, a principal of defendant, told Smith, an employee of plaintiff that defendant had gained the attention of potential customers as a result of

plaintiff's radio advertisements. D.I. 21 at C–13–14. Fasick, by affidavit, testifies he made the statement merely as a "joke." D.I. 19 Ex. A at ¶ 14. Fasick's intent, however, does not remove the basis for the statement—actual confusion among consumers as to the source of the advertised mortgages.

In addition, plaintiff has produced evidence demonstrating that: (1) plaintiff received mail meant for defendant (D.I. 21 at C–14, C–23, C–29; PX–1, PX–2, PX–5–8); (2) plaintiff actually paid bills by mistake which were the responsibility of defendant (D.I. 21 at C–14–15); and (3) a temporary employee presented herself to plaintiff when she was scheduled to work for defendant (D.I. 21 at C–14). Finally, even those who regularly did business with the two companies were confused. At the hearing, plaintiff offered testimony that one wholesale mortgage company, PHH US Mortgage Corporation, circulated a flyer among its employees attempting to remedy their difficulties in distinguishing plaintiff and defendant. PX–9. The flyer contains the following admonition:

> Rockland vs. Rockwell: What's in a Name? Everything ... When they both just happen to be clients of PHH US Mortgage Corporation. Two of our largest correspondent accounts, ROCKLAND Mortgage and ROCKWELL Mortgage, are experiencing frustration regarding name recognition.
>
> It seems PHH US Mortgage employees have been confusing the two Correspondents. At PHH, we talk about customer sensitivity. Well, this is customer sensitivity in its rarest form!
>
> So, whether you are communicating verbally or through written communication to either company, USE CAUTION. Be certain you are using the correct name. Thank you for your cooperation.

PX–3 (emphasis in original).

In sum, the Court preliminarily finds this instance and other instances of actual confusion to be evidence of the most potent kind.[27] This element therefore heavily tips the scales in favor of a finding of likelihood of confusion.

### g. Summary of Likelihood of Confusion Analysis

Of the ten potentially relevant elements enumerated by the Third Circuit Court of Appeals, defendant concedes the eighth element favors a finding of likelihood of confusion because the targets of the parties' sales efforts are identical. The parties contest all six of the remaining applicable elements.

Of those six, the most important first element, similarity of the marks, also indicates confusion is likely. Elements (2), (4) and (6) further tilt the scale in favor of a finding of likelihood of confusion. Plaintiff's mark, as an arbitrary mark with high consumer recognition value, is relatively strong both conceptually and commercially. In addition, instances of actual confusion followed closely in time upon defendant's commencing use of its similar mark. Elements (3) and (5), however, weigh against finding consumers are likely to confuse the two marks. Because the products involved are retail mortgages, consumers are expected to use greater care in making a purchase. Furthermore, defendant has not used its mark in bad faith.

The Court finds on the preliminary injunction record that despite defendant's good faith use of its mark,[28] the similarity between the two marks has caused confusion between them and is likely to cause more confusion in the future. The greater attention which consumers are expected to pay has not prevented the instances of actual confusion demonstrated by plaintiff.

In sum, the Court finds plaintiff is likely to succeed on the merits after trial for three reasons: first, plaintiff's mark is valid and protectable; second, plaintiff is the owner of its mark; and third, defendant's use of its mark to identify its mortgages is likely to create confusion concerning their source and the affiliation, connection or sponsorship between plaintiff and defendant.

### B. Irreparable Harm to the Parties

The second and third factors to be considered in determining whether to provide pre-

---

27. Indeed, every class of consumer has experienced confusion in distinguishing between plaintiff's ROCKLAND MORTGAGE CORP. mark and defendant's ROCKWELL NATIONAL MORTGAGE mark.

28. This may be an unusual case, for "[i]t may be that only in unusual cases will a defendant be found to have both knowledge of a senior user and good faith adoption of the allegedly infringing mark." *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990).

liminary injunctive relief are the extent to which plaintiff is suffering irreparable harm, and the extent to which defendant will be irreparably harmed if the preliminary injunction is granted. "Irreparable injury may be shown by 'loss of control of reputation, loss of trade ... loss of goodwill,' possibility of confusion, and most importantly in a suit for infringement of a trade or service mark, 'infringement amounts to irreparable injury as a matter of law.'" *Accu Personnel*, 823 F.Supp. at 1173 (quoting *Jiffy Lube*, 968 F.2d at 378).

In the present case, the Court has concluded plaintiff is likely to succeed at trial on its claim defendant is infringing its trademark. According to the formulation of the Third Circuit Court of Appeals, then, plaintiff has necessarily demonstrated irreparable injury. *Id.*

Defendant's attempts to avoid this result are unavailing. First, defendant argues instances of actual confusion are not harmful because they reflect "mere inconvenience of some misdirected mail or telephone calls...." D.I. 19 at 19. The Court does not agree. Notwithstanding its finding of irreparable harm as a matter of law, the Court believes the instances of actual confusion demonstrated by plaintiff indicate far greater potential for irreparable harm than defendant would have the Court believe. Plaintiff has made a strong showing that after five years in business, it is losing control of its reputation because numerous customers, both ordinary and professional, have complained to plaintiff about services rendered instead by defendant. D.I. 21 at C–6, C–8, C–23, C–32–33. One realtor, for example, testified by affidavit: "I was upset [my company] was not advised of the cancellation [of a closing] and believed that the mortgage company had 'dropped the ball' for not informing me.... While I later found out that the mortgage company was ROCKWELL NATIONAL MORTGAGE, ... I called Kevin Jornlin at ROCKLAND MORTGAGE." *Id.* at C–32–33. The No one knows how many were similarly upset, but did not take the time to register their complaints. Further, Jornlin testified by affidavit that plaintiff plans to "expand regionally and then nationally after establishing [itself] in the Delaware and Southeastern Pennsylvania market," the very market occupied by defendant.[29] D.I. 21 at C–1. Plaintiff's past expansion tends to support these plans. D.I. 15 at A–2 ("[p]laintiff has been continuously engaged in the business of providing retail mortgage services since the beginning of its operations in New Castle County, Delaware and later in various counties in the state of Pennsylvania"). Thus, plaintiff's injury is likely to expand as its company expands.

Second, defendant contends plaintiff's delay in moving for a preliminary injunction demonstrates a lack of irreparable injury to plaintiff. Delay in seeking preliminary injunctive relief may be some evidence plaintiff will not incur injury, *see Jiffy Lube*, 968 F.2d at 378–79, but the present record does not support this proposition.

Plaintiff first learned defendant was using the ROCKWELL NATIONAL MORTGAGE mark in February of 1993, when instances of actual confusion with its own ROCKLAND MORTGAGE CORP. mark began to arise. D.I. 21 at C–4. On March 24, 1993, plaintiff notified defendant by letter that plaintiff considered that use an infringement. D.I. 19 Ex. A–3. In its letter, plaintiff demanded defendant cease and desist from using the ROCKWELL NATIONAL MORTGAGE mark. *Id.* On April 6, 1993, defendant sent a letter denying infringement. D.I. 19 Ex. A–4. Accordingly, on April 29, 1993, plaintiff filed a complaint alleging trademark infringement, unfair competition, and deceptive trade practices and praying for injunctive relief. D.I. 1. On May 25, 1993, defendant filed its answer denying infringement. D.I. 5. Discussions between the parties, through their attorneys, occupied the early part of the summer. D.I. 21 at C–41. Finally, on August 2, 1993, approximately three months after the filing of its complaint, plaintiff filed

---

**29.** As of August 27, 1993, when defendant filed its answering brief, defendant had one office in Wilmington, Delaware; seven in Pennsylvania; one in southern New Jersey; one in Maryland; and one in Virginia. D.I. 19 Ex. B at ¶ 3. The Court notes all eleven are in the region surrounding plaintiff's offices.

the present motion for a preliminary injunction. D.I. 15.

The Court holds this delay was a reasonable one, particularly because it was occupied, in part, by attempts to resolve the matter without resorting to further litigation. D.I. 21 at C–41 ¶ 7. Plaintiff proceeded "as soon as it was apparent that the Defendant would not be willing to change its name to a less confusing name...." *Id.* at ¶ 9. *See Jiffy Lube*, 968 F.2d at 378 (finding a three and one-half month delay between institution of the action and the filing of a preliminary injunction motion to be "a reasonable delay"). Defendant's allegations at the hearing of an unexplained delay of six months or more fly in the face of the record.

Having shown its own irreparable injury, plaintiff must also show its benefits from a preliminary injunction are not outweighed by irreparable injury to defendant. *Jiffy Lube*, 968 F.2d at 379. Plaintiff asserts the benefits flowing from a preliminary injunction would primarily include regaining control over its reputation and good will, built over five years and with an investment of over $100,000, pending the outcome at trial. D.I. 15 at 3, 19. In addition, an injunction barring defendant from further use of its mark would bring a halt to the confusion experienced by consumers as to which mortgage is serviced by which company. D.I. 21 at 19–20. Defendant, in turn, contends it would suffer "significant" injury from a preliminary injunction because it "has spent the last nine months establishing its name and developing a reputation" in its trade area. D.I. 19 at 9. To that end, defendant has expended $27,000 on advertising in those months. D.I. 19 Ex. B at ¶ 11. While defendant also claims to have committed $250,000 to a one year advertising contract, *id.* at ¶ 12, defendant conceded during argument at the hearing it has actually committed a much smaller sum of no greater than $100,000.[30] In addition to these promotional costs, defendant asserts loss of good will in having to change its name in eleven offices after only nine months in business.[31] *Id.* at 10.

The Court holds the benefits to plaintiff of granting a preliminary injunction outweigh the irreparable harm that injunction would cause defendant. Plaintiff's loss of control over its own reputation for service, after over five years in business, is far greater than defendant's loss of reputation as a result of having to change its name after only nine months in business. Good will tends to grow over time. In addition, regardless of its intent, defendant knew of plaintiff's mark before choosing its own. *See Jiffy Lube*, 968 F.2d at 379 ("[defendant] is certainly harmed by the threat of loss of his franchise, but his self-inflicted harm is far outweighed by the immeasurable damage done [plaintiff] by the infringement of its trademark"). Therefore, these two factors militate in favor of the grant of a preliminary injunction.

## C. Public Interest

Finally, the Court considers whether granting preliminary injunctive relief would further the public interest. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians*, 920 F.2d at 197 (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:21 (2d ed. 1984)). In this case, defendant's use is likely to cause further public confusion. Injunctive relief is therefore in

---

**30.** Plaintiff claims "the monies could equally be applied to Defendant's promotion of a new less confusing name to identify its company," D.I. 21 at 18, but the parties adduced no evidence as to this assumption. Therefore, the Court does not consider it.

**31.** Interestingly enough, defendant makes other assertions which, if true, would eliminate any possibility of harm from changing its name. First, defendant claims that ordinary consumers choose a retail mortgage company not on the basis of its name, but on the basis of its rates.

D.I. 19 at 1. Second, defendant claims professional consumers choose a retail mortgage company not on the basis of its name, but on the basis of past business relationships. *Id.* If defendant is correct, it has made its claims of irreparable harm disappear. *Compare Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (3d Cir. 1984) (finding the defendant was not "irreparably harmed" because it could remove the label from its goods and then sell them). At bottom, defendant is arguing that its name is important but plaintiff's name is not.

the public interest. *Jiffy Lube*, 968 F.2d at 379.

## IV. CONCLUSION

Plaintiff is entitled to preliminary injunctive relief. Plaintiff is likely to prevail on the merits of its trademark infringement, unfair competition, and deceptive trade practices claims. Plaintiff will be irreparably harmed unless a preliminary injunction is issued, and defendant will suffer a far lesser harm if such relief is granted. Finally, the public interest will be served by preliminarily enjoining defendant.

An order will be entered enjoining defendant from using the ROCKWELL NATIONAL MORTGAGE mark throughout plaintiff's trade area and regional zone of expansion pending final judgment.